Eric M. **FREEDLANDER**, Donna Leigh Keeler, Plaintiffs,

v.

**EDENS BROADCASTING, INC.**, d/b/a **WRVQ Radio Station**, Defendant.

Civ. A. No. 90–00016–R.

United States District Court, E.D. Virginia, Richmond Division.

March 30, 1990.

222

Eric M. Freedlander and Donna Leigh Keeler, Burbank, Cal., pro se.

Andrew J. Ellis, Jr. and Robert L. Brooke, Mays & Valentine, Richmond, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on defendant's motion to dismiss plaintiffs' complaint and on defendant's motion to strike plaintiffs' prayer for punitive damages in Count I of their complaint, pursuant respectively to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion to dismiss is granted, thereby mooting defendant's alternative motion.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs originally brought suit in the Circuit Court for the City of Richmond alleging that Edens Broadcasting, Incorporated, d/b/a WRVQ Radio Station ("Edens") defamed them by broadcasting a song containing libelous and slanderous statements. Defendant properly removed the suit on January 11, 1990, to federal court, where plaintiffs' counsel moved to withdraw.[1] This Court granted plaintiffs' counsel's motion on March 15, 1990, and plaintiffs are now proceeding *pro se.*

This action arose out of Eden's broadcast over its Richmond radio station WRVQ–94 FM of an allegedly defamatory song concerning the plaintiffs, sometime in November of 1988. The lyrics of the song are:

I'm gonna write a little letter,
Gonna mail it to my local D.A.
I wanna find out when they're gonna lock this money jockey away.
Roll over Freedlander,
It's about time you pay.
You know the debts, they're a-risin
And the banks are blowin a fuse.
Your heartbeat is thumpin
So you know what you got to do.
Roll over Freedlander,
And tell Chuck Fishburne the news.
So sell your wheels and lock it ...

Don't keep your Rolex, you better hock it
. . .
Close you mansion and move on out ...
Just call your mother and move on in
With your live-in lover ...
Roll over Freedlander,
The Feds are closin on you.
Well, early in the mornin she'll be givin you the warnin, .
Better put on your coat and your shoes,
Hey nannie, nannie they be comin for the money.
They won't take no excuse.
Roll over Freedlander,
Looks like you're gonna lose.
Roll over Freedlander!
Roll over Freedlander!
Roll over Freedlander!
Roll over Freedlander, you got those bankruptcy blues.

Plaintiffs' Exhibit A.

Plaintiffs complain that the song contains false factual information which is defamatory, and its broadcast adversarily affected their reputations. They also allege that the song implies the commission by plaintiffs of a criminal offense involving moral turpitude.[2] They claim that defendant's publication was intentional, wanton, reckless, and malicious, which, as a result, caused plaintiffs to suffer damage to their reputations and standing in the community and to incur personal humiliation and mental anguish. In their prayer for relief, plaintiffs ask for compensatory damages, punitive damages, and legal fees.

Defendant argues that plaintiff's complaint should be dismissed for various reasons including: (1) the complaint fails to allege the exact defamatory words allegedly published by Edens; (2) the song is not capable of a defamatory meaning; (3) the complaint fails to allege sufficient facts to show that the song is "of and concerning" plaintiffs; (4) the song is not defam-

---

1. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. Plaintiffs were at the commencement of this action citizens of Georgia. Defendant was incorporated in Arizona and maintains its principal place of business in Phoenix, Arizona.

2. The song has not been challenged on the basis of its modest, if any, literary merit.

atory *per se;* and (5) the song is not defamatory *per quod.*

■ Contrary to defendant's assertions, the Court concludes that the plaintiffs' complaint adequately alleges the defamatory words published by Edens. The plaintiffs properly attached the lyrics of the song to their complaint. Although defendant argues that plaintiffs have failed to highlight the exact language which is allegedly offensive, it is clear they mean that the song in its entirety is demeaning. Accordingly, this ground for dismissal is meritless.

■ Defendant also attacks the complaint's failure to establish that the song concerns the plaintiffs. Again, this argument is unpersuasive, particularly with respect to Mr. Freedlander. The song names Mr. Freedlander and refers specifically to his financial turmoil. Given Mr. Freedlander's notoriety at the time of the broadcast, a reasonably informed listener would have known which Freedlander the song was referencing. *See Gazette, Inc. v. Harris,* 229 Va. 1, 325 S.E.2d 713, 738, *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643, 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985) (the "of and concerning test" is met if the plaintiff shows that the publication was intended to refer to him and would be so understood by persons reading it who knew him. *Id.*). As to Ms. Keeler, her claim is obviously weaker. Her name is never mentioned in the song. She assumes the song refers to her when it mentions Freedlander's "live-in lover." Despite the vagueness of the reference, the Court finds that the song is "of and concerning" Ms. Keeler, and notes at the outset that there are even stronger grounds for dismissal of her complaint.

Unpersuaded by these arguments, the Court grants defendant's motion to dismiss for the following reasons: (1) as a matter of law, the song is not defamatory; (2) even if the song were capable of a defamatory meaning, plaintiffs are public figures, and there was no actual malice on the part of defendant in broadcasting the song.

## II. ANALYSIS

As is often recited, a "good name" is the "immediate jewel" of the soul.[3] The common law of slander and libel is thus designed to effectuate society's "pervasive and strong interest in preventing and redressing attacks upon reputation."[4] Undoubtedly, defamation actions cannot fully rehabilitate individual dignity; nevertheless, it is well-understood that "the jingl[e] of the guinea helps the hurt that Honor feels."[5]

Where plaintiffs, such as Mr. Freedlander and Ms. Keeler, seek to avail themselves of this pecuniary salve, courts must balance the state's interest in compensating private individuals for injury to their reputation against the first amendment interest in protecting public speech. *Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 2944–45, 86 L.Ed.2d 593 (1985); Post, *supra* note 1. This analysis requires that the Court initially determine whether the controversial publication is indeed defamatory and if so, whether it is "of a character which the principles of the First Amendment ... protect." *New York Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964).

### A. The Lyrics of the Song Are Not Capable of a Defamatory Meaning.

#### 1. Defamation Per Se

Under the common law of slander, damages are presumed if the communication at

3. W. Shakespeare, Othello, act III, scene iii, 11 155–61:
Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; 'tis something, nothing,
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name

Robs me of that which not enriches him,
And makes me poor indeed.

4. Post, "The Social Foundations of Defamation Law: Reputation and the Constitution," 74 *Calif. L.Rev.* 691 (1986); *Rosenblatt v. Baer,* 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966).

5. Lord Alfred Tennyson, *Locksley Hall,* 1.105 (1842).

issue constitutes slander *per se.* In Virginia, the following words are actionable as defamatory *per se:*

(1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade. All other defamatory words which, though not in themselves actionable, occasion a person special damages are actionable.

*Great Coastal Exp., Inc. v. Ellington,* 230 Va. 142, 147, 334 S.E.2d 846, 849 (Va.1985); *Carwile v. Richmond Newspapers,* 196 Va. 1, 7, 82 S.E.2d 588, 591 (Va.1954).

■ In this case, plaintiffs allege that defendant has slandered them by imputing that they committed some criminal offense involving moral turpitude. The Restatement (Second) of Torts § 571 (1976) provides that in order to fall within the first category of words actionable *per se,* the words must impute a crime which is either "punishable by imprisonment in a state or federal institution" or "regarded by public opinion as involving moral turpitude."

Because the song at issue does not specify the exact crime committed, the Court must look to the general statements of the song to determine the nature of the criminal activity allegedly imputed. In the lyrics of the song, Freedlander is referred to as a "money jockey." The song also suggests that "the debts, they're a-risin/ And the banks are blowin a fuse" and "The Feds are closin on you." None of the above-listed references suggests the commission of an offense punishable by imprisonment. At most, they suggest that plaintiff Freedlander is in bankruptcy and is subject to criminal investigation.

Neither does the song impute any criminal offense involving moral turpitude. The Supreme Court of Virginia has defined a crime involving moral turpitude as " 'an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' " *Great Coastal,* 334 S.E.2d at 850, *quoting Taskeer v. Commonwealth,* 202 Va. 1019, 1024, 121 S.E.2d 459, 463 (Va. 1961). The question of whether an offense involves moral turpitude is one particularly suitable for the trial court's judgment. *Bell v. Commonwealth,* 167 Va. 526, 538, 189 S.E. 441, 447 (1937).

The benign lyrics of the song certainly do not accuse Mr. Freedlander of any act of baseness, vileness, or depravity. In some financial circles, particularly in a capitalistic society such as ours, being characterized as a "money jockey" could be considered more complimentary than derogatory. In short, to the extent that the defendant even imputes any criminal conduct on the part of Mr. Freedlander, such conduct does not involve moral turpitude. Even drawing every fair inference from the allegedly defamatory language in favor of Mr. Freedlander, the lyrics of the song cannot withstand the tortured interpretation offered by plaintiff.

■ By any stretch of the imagination, the Court cannot find any actionable imputation of criminal conduct to Ms. Keeler. While there is an oblique reference to her as Mr. Freedlander's "live-in lover," that reference is not actionable under the law of defamation *per se.* The Code of Virginia §§ 18.2–344 and 18.2–345 (1975) provide, respectively:

Fornication.—Any person, not being married, who voluntarily shall have sexual intercourse with any other person, shall be guilty of fornication, punishable as a Class 4 misdemeanor.

Lewd and lascivious cohabitation.—If any persons, not married to each other, lewdly and lasciviously associate and cohabit together, or, whether married or not, be guilty of open and gross lewdness

and lasciviousness, each of them shall be guilty of a Class 3 misdemeanor.

Under § 18.2–11 of the Virginia Code, the punishment for a conviction of a Class 4 misdemeanor is a fine not more than $100, and for a Class 3 misdemeanor, a fine of not more than $500. In Virginia, the crime of cohabitation, when prosecuted, is punishable by a fine, not imprisonment. Although, perhaps fifty years ago, the crime of cohabitation and fornication may have been considered to involve moral turpitude, the Court finds that such activity does not fall within the meaning of the Virginia Supreme Court's definition of moral turpitude. This is evidenced by the absence of prosecutorial vigor in this area of the law. *See Doe v. Duling*, 782 F.2d 1202 (4th Cir.1986) ("Recorded cases reveal that the application of the statutes to such activity is, at most, a matter of historical curiosity … [N]ot one arrest has been shown to involve the behavior at issue in this case. Arrests for fornication and cohabitation arose instead form prostitutional or non-private behavior." *Id.* at 1206).[6]

Thus, the lyrics of the song do not specifically accuse plaintiffs of any egregious violations of normative behavior or morals. The song is thus not defamatory *per se.*

### 2. *Defamation Per Quod*

■ Under Virginia law, the defamatory meaning of published words "may arise by innuendo from the published words in combination with known extrinsic facts, the 'inducement' ('defamation per quod')." *Wilder v. Johnson Pub. Co., Inc.*, 551 F.Supp. 622, 623 (E.D.Va.1982).

Plaintiffs' complaint fails to set forth the inducement. While this deficiency, in itself, is sufficient reason to dismiss plaintiffs' suit, because plaintiffs are proceeding *pro se* the Court will give the point closer scrutiny.

The Court finds that the extrinsic facts to which the complaint makes vague reference to are those reported in the local Richmond newspapers in November of 1988 through December, 1988.[7] Essentially, those articles reported that settlements had been reached in two lawsuits against Mr. Freedlander, who had filed personal bankruptcy and whose second-mortgage company was also in bankruptcy. Both suits involved allegations by two banks of fraud and misrepresentation. At least two news articles reported that Mr. Freedlander's company was believed to be under the scrutiny of the FBI.[8] Another article reported the fact that Mr. Freedlander's companion and roommate had sold some of her jewelry to pay part of his debt to his former wife.[9]

Again the only defamatory meaning plaintiffs attribute to the song is the imputation of the commission of some crime. Defendant contends that such an innuendo does not flow from the song and that the ascribed meaning is, as a matter of law, not defamatory.

In an action for defamation, "every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Carwile*, 82 S.E.2d at 592. Even applying this standard of the law,

---

**6.** Correlatively, the song also characterizes Mr. Freedlander as a "live-in lover." The analysis with respect to the laws against fornication and co-habitation is equally applicable to his claim.

**7.** Plaintiffs allude to the following articles in their supporting brief in opposition to defendant' motion to dismiss.

The factual backdrop against which the broadcast was aired was laid out in several newspaper articles: "Judge Will Review Settlement by Freedlander and Two Firms," *The Richmond News Leader* (Nov. 9, 1988); "Freedlanders Settle Suits with Lenders," *The Richmond Times–Dispatch* (Nov. 17, 1988); "Friend Sells Jewelry; Freedlander Remains Free," *The Richmond Times–Dispatch* (Nov. 19, 1988);

"Freedlander Case Judge Approves Some Payments," *The Richmond Times–Dispatch* (Dec. 10, 1988); "New Freedlander Issue Raised: Large Sums Misappropriated, Freedlander Trustee Charges," *The Richmond Times–Dispatch* (Dec. 11, 1988).

**8.** "Judge Will Review Settlement by Freedlander and Two Firms," *The Richmond News Leader* (Nov. 9, 1988); "Freedlanders Settle Suits with Lenders," *The Richmond Times–Dispatch* (Nov. 17, 1988).

**9.** "Friend Sells Jewelry; Freedlander Remains Free," *The Richmond Times–Dispatch* (Nov. 19, 1988).

plaintiffs cannot withstand a motion to dismiss.

■ Without doubt, the song does not cast plaintiffs in a favorable light. The lyrics of the song poke fun at Mr. Freedlander's well-publicized financial troubles. Nevertheless, the Court cannot find any defamatory meaning which flows readily from the song and the inducement.

This is also true with respect to references to Ms. Keeler and Mr. Freedlander's personal relationship. It appears to the Court that Ms. Keeler objects to being referred to as Mr. Freedlander's "live-in lover." While the alleged status of their relationship might offend the moral sensibilities of some, cohabitation, in the context of today's social mores, cannot be said to be behavior involving moral depravity or deviation.[10] Furthermore, the song's characterization of their relationship, albeit flippant and somewhat unflattering, is not apparently far from the truth.

To the extent plaintiffs are depicted unfavorably, the Court concludes that such depictions are truthful. It is well-settled that in an action for defamation, truth is an absolute defense. *Sullivan*, 376 U.S. at 279, 84 S.Ct. at 725; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Gazette*, 325 S.E.2d at 725 (in Virginia truth is no longer an affirmative defense; instead, plaintiff must prove falsity of statements). Here the defendant's song did not extend beyond the realm of truth. The assertions that "the debts, they're a-risin," "the banks are blowin a fuse," and "The Feds are closin on you" all have a factual basis. The reference to Ms. Keeler as his "live-in lover," although not tactfully put, is also grounded in fact.[11] Although the song may not be entirely truthful in all of its factual particulars, it does not exceed the zone of truth. *Id.* 376 U.S. at 279, 84 S.Ct. at 725. For instance, although Mr. Freedlander may not in fact own a Rolex watch, references to such a watch and his mansion are metonymic allusions to his wealth. As such, they are figurative expressions of a known fact.

Plaintiffs make much to do out of the alleged fact that an WRVQ disc jockey stated over the air that he was "concerned that he [might] be sued for the publication." According to plaintiffs this is evidence that defendant seriously doubted the truthfulness of the song's representations. The Court does not agree with plaintiffs' interpretation of this statement. At most it was a self-congratulatory, wishful overstatement of the song's cleverness, intended to make the song seem more piquant; at worst, it was a jocular, off-the-cuff remark. Regardless, the Court finds that even if an agent of Edens expressed concern over the legal ramifications of airing the song, this is not convincing evidence that defendant doubted the truthfulness of the song's lyrics, particularly in light of the song's factual basis and obvious innocuity.

Thus, the Court finds that the song did not contain false statements of fact and that defendant was not negligent in its broadcast of the song. Although the Court finds as a matter of law that the song is not defamatory, it will briefly address the arguments raised by defendant and plaintiffs in their supporting memoranda.

Defendant relies heavily on its two assertions that the song is a humorous or comedic expression that is not reasonably capable of a defamatory meaning and that the song is a statement of opinion. Plaintiff, urges the Court to allow plaintiffs the

---

**10.** *But cf. Gazette*, 325 S.E.2d at 732 (news item suggesting that a female committed the crime of fornication and became pregnant is potentially defamatory). It is unclear from the court's opinion whether the defamatory potential of the article was attributable merely to the fact of the fornication or to the inference that the female consequently became pregnant from such act. Regardless, that case is distinguishable because the article's allusion to plaintiff as an unwed mother-to-be was false.

See *supra* pp. 225–226 for discussion regarding the criminality of cohabitation and fornication.

**11.** In the *Richmond Times–Dispatch* article of November 19, 1988, Ms. Keeler is referred to as Mr. Freedlander's roommate and companion. To the extent defendant believed Ms. Keeler to be Mr. Freedlander's "live-in lover," the Court finds that defendant, relying on such news reports, had reasonable grounds for such belief.

protection of private citizens, rather than public figures. While this distinction is relevant to the level of protection afforded to private citizens versus public officials or public figures, because of the Court's finding above, this distinction does not bear on the ultimate outcome of this case.

### 3. The Song is a Comedic Expression

[Comedy] it is who proposes the correcting of pretentiousness, of inflation, of dullness, and of the vestiges of rawness and grossness yet to be found among us. She is the ultimate civilizer, the polisher.[12]

■ Humor is a protected form of free speech, to be protected as much, under appropriate circumstances, as political speech, journalistic exposes, or religious tracts. *Salomone v. Macmillan Publishing Co.*, 97 Misc.2d 346, 349–50, 411 N.Y. S.2d 105, 108 (N.Y.Sup.Ct.1978), *rev'd on other grounds*, 77 A.D.2d 501, 429 N.Y. S.2d 441 (N.Y.App.Div.1980). Humor and comedy, however, do not enjoy constitutional protection. *See Polygram Records, Inc. v. Superior Court*, 170 Cal.App.3d 543, 216 Cal.Rptr. 252 (Cal.Ct.App.1985).

■ In *Greenbelt Coop. Pub. Assoc. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), the Supreme Court employed the standard of whether even the most "careless reader" would perceive that the allegedly defamatory language was no more than "rhetorical hyperbole." *Id.*, at 14, 90 S.Ct. at 1541; *see Pring v. Penthouse International, Ltd.*, 695 F.2d 438 (10th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). In cases involving comedic expressions, courts must examine the challenged statement in light of its content, its effect on its audience, and the context of its delivery. *Id.*, 170 Cal.App.3d at 556–58, 216 Cal.Rptr. 252; *Frank v. National Broadcasting Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869 (N.Y. App.Div.1986).

■ The allegedly defamatory lyrics of the song broadcast by defendant were intended to amuse, rather than to injure. The song itself is a parody of a well-known song by Chuck Berry. The nonsensical nature of the lyrics would have alerted even the most careless reader to its comedic intent. For instance, the song directs Mr. Freedlander to "move on in" with his "live-in lover." The illogic of such a directive suggests that the song is an irreverent, but not defamatory, commentary.

The context of the publication of the song would also signal to the reader that the ditty was a comic parody. The song was allegedly published during the Station's morning comedy and music show, the "Q Morning Zoo." As such, it is impossible to believe that a reader would have perceived the song to be anything else than irrelevant and irreverent social commentary. *See Polygram Records*, 170 Cal. App.3d at 552, 216 Cal.Rptr. 252 (the court ruled that a comedic monologue was not actionable as a matter of law since "an obvious joke, told during an obvious comedy performance is a form of irrelevant social commentary, is not taken seriously, and thus does not affect reputation in a manner actionable in defamation").

After examination of the song at issue in this case, the Court concludes that a reasonable listener could not have helped but find the song humorous.[13]

### B. Even If Defamatory, Plaintiffs Cannot Show Actual Malice.

It is plaintiffs, not defendant, who raise the issue of their status as private citizens. Interestingly enough, defendant does not invoke the protection of *New York Times*

---

**12.** Meredith, George, *The Egoist* (1879).

**13.** Having found that the song is a comedic expression based on fact, the Court deems it unnecessary to pursue defendant's argument that the song constitutes protected opinion. The Court will note, however, that the song is protected under this rationale. In short, the song is a protected interpretation, weakly substantiated and subjective in character, of legal events concerning plaintiffs. *See Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280 (4th Cir.1987); *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) (setting forth four-prong analysis of whether statements are fact or constitutionally protected opinion).

*Co. v. Sullivan* and argue that plaintiffs are limited public figures who must establish that the defendant acted with malice. 376 U.S. 254, 84 S.Ct. 710. Relying on *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), plaintiffs claim the more generous protection afforded to private individuals. (Under *Gertz*, private citizens need only show negligence to recover compensatory damages, and must show actual malice to recover punitive or presumed damages.)

Under the *Sullivan* standard, a defendant escapes liability unless the plaintiff, either a public official or a public figure, can prove publication of a defamatory falsehood " 'with actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280, 84 S.Ct. at 726. Plaintiffs argue that they are private individuals and need prove negligence on the part of defendant by a preponderance of evidence in order to recover compensatory damages.[14] *Gazette v. Harris*, 325 S.E.2d at 713.

The Court must now turn its consideration to whether plaintiffs are public or private figures. There are two bases for public figure status:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz*, 418 U.S. at 351, 94 S.Ct. at 3012.

The Supreme Court's distinction in *Gertz* between public and private figures was based on two considerations: the plaintiff's access to the media, and the extent to which the plaintiff, by virtue of his position in the community or involvement in a particular matter of public concern, can be

said to invite public comment and attention. *Id.* 418 U.S. at 344–45, 94 S.Ct. at 3009; *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 686–87 (4th Cir.1989). Another aspect of the analysis focuses on whether the plaintiff was directly involved in a pre-defamation public controversy. *Blue Ridge Bank*, 866 F.2d at 688.

Whether and to what extent a person is a public figure is a matter for the court to decide. In this case, plaintiffs are not general purpose public figures. They are, however, limited purpose public figures. They assumed an especial prominence in the affairs of society that invited attention and comment. *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009.

Although the fourth circuit deemed it unnecessary to decide whether a convicted murderer is a public figure, it intimated that in light of *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), a convicted felon would most likely qualify as a public figure. The Supreme Court in *Cox* stated that "[t]he commission of crime, prosecution resulting from it, and judicial proceedings arising from the prosecutions ... are without question events of legitimate public concern." *Id.*, at 492, 95 S.Ct. at 1044. The court properly noted that *Cox* involved an invasion of privacy rather than libel suit. In addition, the Court warned against extending *Cox* to require the showing of actual malice in libel suits arising out of reports of judicial proceedings, and it emphasized the importance of the voluntariness of the libel plaintiff's fame.

Thus, a plaintiff must become involved in a "public controversy." Although the Supreme Court has not defined exactly what it means by the phrase, in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court indicated that matters which are essentially private, such as the issues in a divorce proceeding, do not become public for purposes of libel law because they are aired in a public forum. In *Firestone*, the Court emphasized the

---

**14.** Although plaintiffs claim in their response to defendant's motion to dismiss that they are entitled to this threshold of proof, in their com-

plaint they allege that defendant acted with actual malice.

absence of voluntariness as its basis for concluding that the plaintiff had not sacrificed her interest in protecting her reputation.

It is another matter, however, when an individual is infamous because of who s/he is and what s/he has done. In *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440 (S.D.Ga.1976), the court held that where a plaintiff had previously received extensive publicity relating to his alleged underworld contacts and involvements, and where such publicity came from his voluntary contacts and involvements, he was a "public figure."

 Likewise in this case, plaintiff Freedlander voluntarily engaged in a course that inevitably invited attention and comment.[15] Although he may not have had access to the media to contradict the accusations directed against him, by way of his business dealings, he not only thrust himself into the vortex of a public issue, he created the public controversy.[16]

Accordingly, the Court finds that as a public figure, plaintiff Freedlander must show that the allegedly defamatory statements were made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

Based on all of the allegations of the complaint, accepted as true, and all of the pleadings submitted, it appears to the Court to a certainty that the plaintiffs would not be able to prove that the statements were false, and hence defamatory. Nor would they be able to prove by clear and convincing evidence that the song was published with malice.[17] Thus, plaintiffs would not be entitled to relief under any state of facts which could be proven in support of its claim. *Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir.1982).

As additional discussion might further dignify the insubstantial nature of plaintiffs' complaint, the Court hereby grants defendant's motion to dismiss. The Court orders judgment in favor of defendant and against plaintiffs, and further orders dismissal of plaintiffs' complaint.

It is so ORDERED.

---

**15.** Ms. Keeler is an even more limited public figure than Mr. Freedlander. Even, however, if she were not held to the actual malice standard, the Court concludes that she could neither prevail according to a negligence standard.

**16.** The court in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980), held that "[b]eing an executive within a prominent and influential company does not by itself make one a [limited purpose] public figure." *Id.* at 1299. The court, however, elaborated on its position in *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.) *cert. denied, Tavoulareas v. Washington Post Co.*, 484 U.S.

870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), and stated that an executive's position within a corporation of some prominence is not "irrelevant to whether that person has 'invite[d] attention and comment' with respect to public issues affecting his business dealings." *Id.* at 773.

**17.** The Court likewise holds that plaintiffs could not prove by a preponderance of evidence that defendant acted negligently, meaning that the publication was false and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based. *Gazette*, 325 S.E.2d at 725.