# CIRCUIT COURT OF THE CITY OF WINCHESTER

Carolyn Steinla

v.

Judy Jackson
and The Winchester
Evening Star, Inc.

May 20, 1997

Case No. (Law) 96-285

BY JUDGE JOHN E. WETSEL, JR.

This is a libel action filed by a teacher against a parent who wrote a derogatory letter to the editor about the teacher and against the newspaper which printed that letter. The defendants demurred to the motion for judgment, and upon consideration of the parties' arguments and their memoranda of authorities, the Court has decided to sustain the demurrers.

## I. *Statement of Material Facts*

The following material facts have been pleaded by the plaintiff.

The plaintiff teaches English at a local middle school.

The defendant Jackson is a parent who had children who attended the middle school and had the plaintiff for an English teacher.

*The Winchester Star*, which is also a defendant, is a newspaper printed in Winchester, Virginia. On November 25, 1995, *The Winchester Star* published an article entitled "English: The Language of Commerce," which featured the plaintiff's English class and described the teacher's curriculum which, as the article's title implies, had some emphasis on the practical application of the English language. The plaintiff claims that reporters for *The Winchester Star*

solicited the plaintiff for the story. The educational program that plaintiff was directing was a program officially approved by the Winchester Public Schools.

On November 29, 1995, the defendant Judy Jackson wrote a letter, published in *The Winchester Star*, criticizing not only the program being directed by plaintiff but also allegedly criticizing the ability, morals, and professionalism of plaintiff. The plaintiff complains specifically about the following which defendant Judy Jackson wrote:

> Two of my children were students (not "employees") in Ms. Steinla's English class, and to put it mildly, they were not academically enriched by the experience .... Well, as a tax-paying parent of two sixth-grade boys enrolled at Daniel Morgan Middle School, I will see to it that my next two potential "employees" are enrolled in a bona fide English class, hopefully one conducted by a teacher who places some value on the subject she or he was ostensibly hired to teach ....
>
> [I]ncidentally, my daughters shared some reading material from Ms. Steinla's English class with me, and frankly I wouldn't classify it as either decent or literature.

This language is the basis of the plaintiff's libel action.

The plaintiff argues that the clear implication of "Jackson's letter is that Ms. Steinla is not professionally competent; that she cannot academically benefit her students; that the class plaintiff taught was not a bona fide English class but was a sham; that plaintiff places no value on the subject she is teaching; and that plaintiff is deliberately exposing her students to reading materials that are indecent and inappropriate for children ...." Plaintiff's Memorandum in Opposition to Demurrers, page 2.

Plaintiff claims that defendant Jackson's statements were false and were either known by her to be false or she lacked reasonable grounds to believe they were true.

The defendants have demurred to the motion for judgment claiming that the words used are constitutionally protected expressions of opinion.

## II. *Conclusions of Law*

### 1. *Demurrer*

In considering a demurrer the Court must apply "the settled rule that a demurrer admits the truth of all well-pleaded material facts. All reasonable

inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading." *Russo v. White*, 241 Va. 23, 24, 400 S.E.2d 160 (1991), quoting *Fox v. Custis*, 236 Va. 69, 71, 372 S.E.2d 373 (1988). In all cases except negligence cases, in ruling on a demurrer, "the court is not bound by ... conclusory [legal] allegations when the issue involves ... a mixed question of law and fact." *Russo v. White, supra*, at 28. *Accord CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993). Having examined the motion for judgment and drawing "all reasonable inferences fairly and justly drawn from the facts alleged ... in aid of the pleadings," it would appear that the demurrers should be sustained.

## 2. *Law of Libel*

"As a part of the rights of personal security, the preservation of every person's good name from the vile arts of detraction is justly included. The laws of the ancients, no less than those of modern nations, made private reputation one of the objects of their protection." *Fuller v. Edwards*, 180 Va. 191, 196, 22 S.E.2d 86 (1942), quoting the *Commentaries* of Chancellor Kent. More apropos to this case is Iago's observation to Othello:

Good name in man and woman, dear my lord,
Is the immediate jewel of their souls.
Who steals my purse steals trash; 'Tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed.

William Shakespeare, *Othello*, Act III, scene 3.

Since the time of Chancellor Kent, the law of libel, like society in general, has undergone dramatic evolution. Recently the courts have struggled to balance the First Amendment right to freedom of expression with the right of the individual to the protection of his personal good name. *See The Gazette, Inc. v. Harris*, 229 Va. 1, 29, 325 S.E.2d 713, *cert. denied*, 472 U.S. 1032 (1985). Since *The Gazette* case, the law of libel has been further refined by the United States Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990), which is discussed at length later.

In *Chapin v. Greve*, 787 F. Supp. 557, 561-563, (E.D. Va. 1992) aff'd *sub nom. Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993), the United States District Court for the Eastern District of Virginia undertook an extensive

discussion of the current resolution of the tension between the First Amendment right to free expression and the personal right to protection of an individual's reputation against calumnious criticism through a defamation action:

Defamation cases compel a careful balancing of vital constitutional and common law rights. On one side of the balance is the First Amendment's fundamental protection of free expression, a free press, and "that 'breathing space' essential to their fruitful exercise." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). *See also Ollman v. Evans*, 242 App. D.C. 301, 750 F.2d 970, 991 (D.C. Cir. 1984) (*en banc*) ("For the contraction of liberty's 'breathing space' can only mean inhibition of the scope of public discussion on matters of general interest and concern."), *cert. denied*, 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662 (1985). On the other side lies the individual's liberty interest in his reputation, the importance of which was articulated by Justice Stewart: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966) (Stewart, J., concurring). *See generally Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 2707-08, 111 L. Ed. 2d 1 (1990) (discussing the need in defamation cases to balance First Amendment guarantees and individual reputational interests); *Gertz*, 418 U.S. at 342 (same); *Ollman*, 750 F.2d at 974 (defamation cases present the "delicate and sensitive task" of accommodating essential First Amendment interests and the common law's protection of an individual's reputation, which is an interest "of the highest order"). Libel law attempts to accommodate these seemingly antithetical interests by, on the one hand, providing a legal remedy for persons subjected to certain defamatory statements, while, on the other hand, limiting the range of statements considered defamatory as a matter of law.

Under Virginia law, the necessary elements of the tort of defamation are (1) publication about the plaintiff, (2) an actionable statement, and (3) the requisite intent. *See* Michie's Jurisprudence, *Libel & Slander*, § 12. Here, the dispositive issue is whether the Greve article constitutes an actionable statement is a matter of law. *See, e.g., Tavoulareas v. Piro*, 260 App. D.C. 39, 817 F.2d 762, 779 (D.C. Cir.) (*en banc*), *cert. denied*, 484 U.S. 870, 98 L. Ed. 2d 151, 108 S. Ct. 200 (1987); *Wilder v. Johnson Pub. Co., Inc.*, 551 F. Supp. 622 (E.D. Va. 1982); *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985); Restatement (Second) of Torts § 614 (1977). To be actionable, material must be both false and defamatory. *See, e.g., Philadelphia Newspapers, Inc. v.*

*Hepps*, 475 U.S. 767, 776, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986); *Falwell v. Penthouse Intern., Ltd.*, 521 F. Supp. 1204 (W.D. Va. 1981); *Gazette v. Harris*, 229 Va. 1, 325 S.E.2d 713, *cert. denied*, 472 U.S. 1032 (1985). Because plaintiffs' allegations of factual falsity must be accepted as true for purposes of this motion to dismiss, *see Scheuer v. Rhodes*, 416 U.S. 232, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Conley v. Gibson*, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324 (4th Cir. 1989), the threshold inquiry here is whether the Greve article is defamatory.

To defame a person is to attack his or her good name, thereby injuring his or her reputation. *See* Webster's II New Riverside University Dictionary (1984). But not every unflattering or unwelcome remark will sustain a libel suit. To be defamatory as a matter of law, a statement must be "more than merely unpleasant or offensive;" it must "make the plaintiff appear odious, infamous, or ridiculous." *McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 540 F. Supp. 1252, 1254 (D. D.C. 1982), *aff'd in part and rev'd in part on other grounds*, 230 App. D.C. 403, 717 F.2d 1460 (D.C. Cir. 1983). *See also* R. Sack, *Libel, Slander and Related Problems* 45 (1980) ("There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing, or that hurts the plaintiff's feelings, without more, is not actionable."). Statements may be defamatory by implication, inference, innuendo, or insinuation, provided the alleged defamatory meaning is plain. *See, e.g., Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707; *White v. Fraternal Order of Police*, 285 App. D.C. 273, 909 F.2d 512 (D.C. Cir. 1990); *Wilder*, 551 F. Supp. at 623; *Gen. Products v. Meredith Corp.*, 526 F. Supp. 546 (E.D. Va. 1981); *Gazette*, 325 S.E.2d at 713; *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588, 591-92 (1954). The established test under Virginia law for divining whether statements are defamatory is found in *Carwile*:

> Although varying circumstances often make it difficult to determine whether particular language is defamatory, it is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used …. In determining whether the words and statements complained of in the instant case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor. However, the meaning of the alleged defamatory language

cannot, by innuendo, be extended beyond its ordinary and common acceptation. The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it cannot introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain. 82 S.E.2d at 591-92 (citations omitted).

Moreover, a plaintiff cannot combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim. *See AIDS Counseling & Testing Centers v. Group W Television, Inc.,* 903 F.2d 1000 (4th Cir. 1990). In addition, under Virginia law statements which impute to a business or professional person conduct which tends to injure her in her business or profession are actionable as defamation *per se,* without proof of special damages. *See Carwile,* 82 S.E.2d at 592.

But the inquiry into whether a statement is actionable does not end with a determination that it is, or is not, defamatory. Not all defamatory statements are actionable. First, as earlier noted, a defamatory statement must be false to be actionable, truth being an absolute defense to a libel action. *See, e.g., Freedlander v. Edens Broadcasting, Inc.,* 734 F. Supp. 221 (E.D. Va. 1990). Second, certain statements of opinion, even if defamatory, are constitutionally protected. *See Milkovich,* 497 U.S. at 17-23, 110 S. Ct. at 2705-08; *Gertz,* 418 U.S. at 339-40. Specifically, *opinion statements, defamatory or otherwise, are not actionable unless they contain provably true or false factual connotations. See Milkovich,* 497 U.S. at 17-20, 110 S. Ct. at 2705-06. Third, in some circumstances defamatory words are not actionable under the doctrine of libel by implication of true facts. *See White,* 909 F.2d at 512. Under this doctrine, liability for libelous implications drawn from true facts attaches only where there is "by the particular manner or language in which the true facts are conveyed ... affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *White,* 909 F.2d at 520 (emphasis in original). As plaintiffs correctly assert, *White* applies only where the facts giving rise to an alleged defamatory implication are true. [Emphasis added.]

In *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990), a high school wrestling coach sued the local newspaper which published an article implying that the coach lied in a judicial proceeding arising from a team altercation. The United States Supreme Court explained that its dictum in *Gertz v. Robert Welch, Inc.,* 418 U.S. 232, 339-340, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974) ("no such thing as a false idea"), did not create a separate First Amendment based protection for defamatory statements

characterized as opinion, as many lower courts had concluded. *Milkovich, supra*, 111 L. Ed. 2d at 17-19. Where opinions are expressed about private persons, the "issue of falsity relates to the defamatory facts implied by a statement [of opinion]." *Milkovich, supra*, footnote 7.

"A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (Second) of Torts § 566. If the implied facts may be tested objectively, then a libel action may lie based on statements of opinion, such as in *Milkovich*, where the United States Supreme Court ruled that the "connotation that the petitioner [Milkovich] committed perjury is sufficiently factual to be susceptible of being proved true or false," and consequently reversed the Ohio Court of Appeals' decision that the article was constitutionally protected opinion.

### 3. Is the Plaintiff a Public Figure or a Private Person?

Under Virginia libel law, a public school teacher is not a public official. *Richmond Newspapers, Inc., v. Lipscomb*, 234 Va. 277, 362 S.E.2d 32 (1987), *cert. denied*, 486 U.S. 1023 (1988). Moreover, the plaintiff is not a public figure. *See generally* Annotation, *Who is a "Public Figure" for Purposes of Defamation Action* (1994):

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case, such persons assume special prominence in the resolution of public questions.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351.

### 4. Libel Per Se

In the recent case of *Perk v. Vector Resources Group, Ltd.*, 253 Va. 310 (1997), the Supreme Court affirmed the trial court's sustaining of a demurrer to a libel action, where an attorney sued defendants who he claimed defamed him by telling some of a hospital's debtors that certain payments made by the debtors had not been reported by the attorney. In ruling, the Supreme Court stated: "At common law, defamatory words which are actionable *per se*

include ... *[t]hose which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. Those which prejudice such person in his or her profession or trade. ...* (Emphasis added.) *Id., quoting Carwile v. Richmond Newspapers,* 196 Va. 1, 7, 82 S.E.2d 588, 591 (1954). *See also Great Coastal Express* v. *Ellington,* 230 Va. 142, 147, 334 S.E. 2d 846 (1985).

"A statement which ascribes to another conduct, character, or a condition which would adversely affect her fitness for the proper conduct of her lawful ... profession is defamatory without proof of special harm." 50 Am. Jur. 2d, *Libel and Slander,* § 212. "Teacher's reputations are very vulnerable to injury when they are the subject of false accusations." 50 Am. Jur. 2d, *Libel and Slander,* § 231.

## 5. Can the Derogatory Words Be Objectively Tested?

The first step in any defamation analysis is to examine the words used to determine whether the language can be fairly viewed to impugn the reputation of the plaintiff. Reputation is personal to the individual, so defamation derives from an attack directed at the individual as opposed to an attack on ideas or opinions espoused by the individual, which in a free society are generally fair game for discussion and attack. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges but on the competition of other ideas." *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 339-340, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). "[W]hether a statement is characterized as a fact or opinion is no longer a relevant inquiry in determining whether it is constitutionally privileged." 50 Am. Jur. 2d, *Libel and Slander,* § 105, citing *Milkovich* v. *Lorain Journal Co.,* 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695. "[T]he threshold question in defamation suits is whether a reasonable factfinder could conclude that the published statements imply a provably false factual assertion ...." 50 Am. Jur. 2d, *Libel and Slander,* § 106. "[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Moldea v. New York Times Co.,* 22 F.3d 310, 313 (D.C. 1994).

Relying upon *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974), the defendants argue that the defendant Jackson was exercising her "fair criticism and comment" on issues of public concern. "To determine if a publication is defamatory, the Court must look at the entire communication and not examine separate sentences or portions or with an eye constrained to the objectionable

feature alone. Construction will be derived from the expressions used in the whole scope and apparent object of the writer." 50 Am. Jur. 2d, *Libel and Slander*, § 124. The defendant Jackson's letter did contain statements which are purely critical of the curriculum, e.g., "I sure wish English teachers would stick to teaching English," and "since when does a 13- or 14-year old need a checkbook?" But in her letter, Mrs. Jackson also proceeded to cast aspersions directly against the plaintiff:

> Two of my children were students (not "employees") in Ms. Steinla's English class, and to put it mildly, they were not academically enriched by the experience .... Well, as a tax-paying parent of two sixth-grade boys enrolled at Daniel Morgan Middle School, I will see to it that my next two potential "employees" are enrolled in a bona fide English class, hopefully one conducted by a teacher who places some value on the subject she or he was ostensibly hired to teach ....
>
> [I]ncidentally, my daughters shared some reading material from Ms. Steinla's English class with me, and frankly I wouldn't classify it as either decent or literature.

"Allegedly defamatory statements must be construed from the standpoint of the average reader or average lay reader. The test is what construction would be placed upon such language by the average reasonable person or the general public." 50 Am. Jur. 2d, *Libel and Slander*, § 127. The plaintiff argues that the clear inference of this language is that Ms. Steinla is unfit as a teacher and teaches indecent material in her class. Interestingly, the letter mentions Ms. Steinla's name five times, which is certainly excessive if the purpose were simply to criticize the curriculum content. Moreover, the author writes, "Perhaps, Ms. Steinla's skills would be put to better use in a corporate environment rather than her captive audience of middle-school children." All of which clearly shows that the person of the plaintiff as well as the content of the English class were the targets of the defendant Jackson's letter, so the letter transcended mere comments on a public issue. Nonetheless, the statements complained of are subjective opinions of the defendant Jackson which cannot be objectively tested.

In her memo, the plaintiff was particularly aggrieved by the charge that the literature she taught was indecent, which is understandable since she is an English teacher. However, an analysis of this complaint illustrates the subjective nature of the subject; hence, its lack as a basis for a libel action. To some Mark Twain's *Huckleberry Finn* and Chaucer's "Miller's Tale" are not

decent literature, while others would stalwartly defend their inclusion in a literature course, and in the Court's course of education, they were taught in public schools in the Commonwealth of Virginia. If those two works prick the sensibilities of some people, one can only imagine the palpitations inflicted by William Butler Yeats' "Leda and the Swan." The point is that the evaluation of what is decent literature is determined by the reader's education, frame of reference, and scale of moral and aesthetic values and not by any objective standard. *See Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. 1994) (statements in a book review were literary opinions which could not be verified, so summary judgment for the defendant publisher was affirmed).

Personal polemics about private persons published in the public press are verbal pyrotechnics; they may ignite as planned and flash brilliantly, or they may fizzle and explode injuring everyone within their proximity. With regard to private persons, the press is not constrained by the rules of polite society, a person may pen a churlish missive about another person and have it printed without legal liability so long as the law of libel is not transgressed. The unfettered clash of competing ideas is the daily grist of the press and is also one of the cornerstones of democracy. It is not mere happenstance that the First Amendment occupies a position of primacy in the Bill of Rights. So long as the dialectic discussion remains on an intellectual level, free range is permitted. However, when public, printed castigations descend to a personal level, not only is the intellectual content of the dialogue diluted, the risk is heightened that the criticism may cross the line and become libelous. "[I]n the prosecution of a favorite scheme, the best of men, satisfied with the rectitude of their intentions, are subject to forget the bounds of moderation ...." Edward Gibbon, *The Decline and Fall of the Roman Empire.*

## 6. *Motion for Sanctions*

The issues presented in this case were complex and required careful study by the Court. While the defendant Jackson's comments were not technically within the pale of libel, they were certainly within the penumbra. There are legal authorities, which if consulted, would certainly suggest that the words were actionable, but such authorities fail to consider the impact of the *Milkovich* Case, whose import has yet to be considered by the Virginia Supreme Court. *See, e.g.,* Annotation, *Libel and Slander: Actionability of Statements Imputing Inefficiency or Lack of Qualification to Public School Teacher*, 40 A.L.R.3d 490 (1971), § 2(a), where the editors state:

Generally, accusations or statements written or oral, imputing to a school teacher want of professional capacity are actionable per se ....

Actionability has been established where the statements imputing inefficiency or lack of qualification to the schoolteacher were general statements derogatory of the teacher's performance, such as that the teacher was incompetent as a teacher, a "weak spot" in the public school system of instruction, or insufficient and inadequate with her students ....

Accordingly, Jackson's motion for sanctions is denied.

### III. *Decision*

For the foregoing reasons, it is adjudged and ordered that (1) the demurrers of Judy Jackson and The Winchester Evening Star, Inc., are sustained, and the motion for judgment is dismissed, with prejudice, and (2) Judy Jackson's Motion for Sanctions is denied.