AIDS COUNSELING AND TESTING CENTERS; John B. Kotmair, Jr.; Andrea Boucher Stringer; David B. Baker; Alva Sayrs Baker, III; Edward L. Kotmair; John B. Kotmair, III; Dorothy M. Dunty; Nathan Fenby; Carol R. Baker; Barbara A. Fillmann; Ronald Stringer, Plaintiffs–Appellants,

and

Shirley Ann Purkey, Plaintiff,

v.

GROUP W TELEVISION, INCORPORATED; Stuart Caplan, Defendants–Appellees.

No. 89–1492.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1990.

Decided May 22, 1990.

As Amended June 13, 1990.

Mark Lane, Washington, D.C., for plaintiffs-appellants.

Edward Leon Wolf, Arnold & Porter, Washington, D.C., Douglas D. Connah, Jr., Venable, Baetjer & Howard, Baltimore, Md., for defendants-appellees.

Andrew J. Groszer, Jr., Cockeysville, Md., on brief, for plaintiffs-appellants.

Hadrian R. Katz, M. Isabel Medina, Arnold & Porter, Washington, D.C., Kathleen O. Gavin, Venable, Baetjer & Howard, on brief, Baltimore, Md., for defendants-appellees.

Before SPROUSE and CHAPMAN, Circuit Judges, and HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

CHAPMAN, Circuit Judge:

This appeal arises out of a suit for defamation and false-light invasion of privacy. In this court, the appellants-plaintiffs contest a number of the district court's rulings that led the court to hold that it had jurisdiction over the matter and to dismiss most of the claims in the complaint. We hold that the appellants have failed to demonstrate that the district court erred in any respect and we therefore affirm the judgment.

I.

Plaintiff AIDS Counseling & Testing Centers (ACT) was an unincorporated business venture organized in Maryland for the purpose of providing AIDS testing to the public as a profit-making enterprise. The individual plaintiffs, ACT's investors, attempted to advertise their business as a faster, easier alternative to the free AIDS testing provided by public agencies in Maryland. The investors touted their business as providing complete confidentiality, as returning test results faster than the public agencies, and as giving customers a written copy of their test results rather than the oral report provided at many other testing centers. One aspect of ACT's operation that proved particularly controversial was its practice of offering an ID card documenting that the bearer had tested negative for AIDS infection.

In order to bring its services to the attention of prospective clients, ACT undertook an aggressive publicity campaign. It distributed over 10,000 flyers in and around

Baltimore. It sent information to dating services around the area and actively sought references from these services. It placed advertisements in supermarkets and in several of the local commercial and campus newspapers and it sent press releases to various of the broadcast media in the Baltimore area.

In a turn of events reminiscent of the tale of King Midas, the appellants succeeded in generating far more publicity for their enterprise than they wished. Their publicity activities drew substantial public attention to the operation of the business, but, unfortunately for ACT and its investors, much of the more widespread publicity was not of the positive tenor that they had hoped to generate. The present action arose out of news stories that the Baltimore television station, WJZ–TV, broadcast on October 29 and November 4, 1987. These broadcasts featured Denise Koch, a reporter for WJZ–TV, and were critical of several aspects of ACT's operation. In the first broadcast the reporter made a number of statements that were incorrect. She reported that ACT had closed its office in Cockeysville, Maryland, and was moving its operation to Baltimore. In fact, the Cockeysville office remained open and ACT was merely opening a second office in Baltimore. Ms. Koch also incorrectly stated that ACT would sell ID cards certifying the test results of those individuals who tested negative for AIDS infection. ACT's practice was to "give" ID cards to those with negative test results, once they had paid ACT's fifty-dollar fee for a test that was available free of charge at public health agencies throughout the state. Finally, the story incorrectly stated that ACT's move into Baltimore had led state officials to "take a hard look" at the firm. The investigations had actually been prompted by consumer complaints filed against ACT with the state Attorney General.

These misstatements were not, however, the aspects of the broadcasts that appear to have been the most harmful to ACT. In both the October 29 and the November 4 stories, Ms. Koch stated that ACT was under investigation by both the State Department of Health and the Maryland At-torney General's Office. She stated that ACT appeared to be operating as a blood collection center without the license that state regulations required. Both broadcasts also reported that many members of the public health community strongly opposed the use of ID cards showing AIDS test results. Ms. Koch explained that the opposition to the cards arose because any test for AIDS represented only a snapshot in time. The cards were meaningless from the moment they were issued because they showed only that the subject had not developed antibodies to the virus before submitting to the test. In the story that aired on November 4, Ms. Koch also interviewed Stuart Caplan, a member of the Baltimore County AIDS Task Force. Mr. Caplan also expressed the concern that ACT's cards could create the erroneous belief that an individual was free of the AIDS virus. Neither of the broadcasts mentioned by name or contained any other information about ACT's investors.

ACT and its investors alleged claims against two defendants: Stuart Caplan and Group W Television. Before the subject broadcasts, Caplan had written several letters to different state agencies severely criticizing ACT's operation of a testing center as a profit-making venture. In addition to denouncing ACT's operation on the November 4 broadcast, Caplan had also spoken with and written to an employee of WJZ–TV before the October 29 broadcast. The purpose of these communications appears to have been to create negative publicity for ACT.

Group W Television, the other defendant, is the Delaware corporation that owns WJZ–TV. Two of the station's employees were the primary actors in the production of the two broadcasts. According to the record, Producer Suzanne Collins decided to produce the October 29 story on ACT after receiving ACT's news release announcing the opening of its testing center in downtown Baltimore. Collins assigned Koch to serve as the reporter on the story. During discovery, Collins and Koch both testified that they had received no communication from Caplan before producing the

story that aired on October 29. Similarly, Caplan testified that he had neither written to nor spoken with either Koch or Collins before the interview which aired as part of the November 4 story.

ACT and its investors originally filed suit in Baltimore City Circuit Court, alleging defamation and false-light invasion of privacy against both defendants. The complaint stated claims against Caplan for the letters that he had written to state agencies in which he criticized ACT's activities; it stated claims against Group W for the October 29 broadcast; and it stated claims against Caplan and Group W, jointly and severally, for the broadcast of November 4. Based on the diversity of citizenship present in the counts against Group W alone, the defendants successfully sought removal to the District Court for the District of Maryland. After removal, the plaintiffs sought leave to amend their complaint in order to join Caplan as a defendant in the counts that had originally alleged claims only against Group W. They sought to join Caplan in these counts although, according to the record developed during discovery, he was entirely unconnected with the October 29 broadcast on which these counts were based.

At a hearing after the close of discovery, the district court denied the plaintiffs' motion for leave to amend their complaint. On the defendants' motion for summary judgment, the district court dismissed ACT's claims against Group W and it dismissed all claims of the individual plaintiffs. At the same hearing, the court quashed subpoenas that the plaintiffs had served after the close of discovery. After the hearing, the only claims remaining were ACT's claims against Caplan for the letters that he had published criticizing ACT's operation. Since these claims against Caplan involved exclusively state law, the district court exercised its discretion and remanded the case to the state court. With the exception of the remand, the plaintiffs challenge each of the rulings of the district court.

## II.

### A. Amendment of the Complaint

In the view of the district court, the plaintiffs sought to amend their complaint solely to defeat diversity and to deprive the court of jurisdiction. Only through a series of the most tenuous inferences could the plaintiffs support their argument that Caplan was in any way connected with the broadcast of October 29. The vast majority of the evidence developed during discovery showed that Caplan had played no part in the earlier of the two broadcasts. Judge Niemeyer noted that the plaintiffs had filed their motion to amend shortly after the case was removed to federal court and before they had undertaken any discovery. This, combined with the lack of persuasive evidence that Caplan had participated in the first broadcast, led the court to refuse the amendment under the doctrine of fraudulent joinder. The court reached this ruling after explicitly recognizing that, under Federal Rule of Civil Procedure 15, leave to amend the pleadings is to be freely granted when justice so requires.

When reviewing a district court's refusal of leave to amend the pleadings, a court of appeals may reverse only when the record shows that the district court has abused its discretion. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). No such abuse exists in this case.

> "Fraudulent joinder" is a term of art, it does not reflect on the integrity of plaintiff or counsel, but is merely the rubric applied when a court finds either that no cause of action is stated against the non-diverse defendant, or *in fact* no cause of action exists. In other words, a joinder is fraudulent if "there [is] no real intention to get a joint judgment, and ... there [is] no colorable ground for so claiming."

*Lewis v. Time Inc.*, 83 F.R.D. 455, 460 (E.D.Cal.1979) (citing *Parks v. New York*

*Times Co.*, 308 F.2d 474, 478 (5th Cir.1962)) (other citations omitted), *aff'd*, 710 F.2d 549 (9th Cir.1983). In order to determine whether an attempted joinder is fraudulent, the court is not bound by the allegations of the pleadings, but may instead "consider the entire record, and determine the basis of joinder by any means available." *Dodd v. Fawcett Publications, Inc.*, 329 F.2d 82, 85 (10th Cir.1964). This is precisely what the district court did.

■ The ruling that Caplan played no part in Group W's broadcast of the October 29 story finds clear support in the record. The appellants have failed to show any manner in which this ruling evinces an abuse of the district court's discretion. We affirm the court's refusal to permit the amendment of the complaint.

### B. Grant of Summary Judgment to Group W

In granting summary judgment to Group W on the claims brought by ACT, the district court ruled that the inaccuracies in Group W's story of October 29 were immaterial and therefore not defamatory.[1] Group W incorrectly stated that ACT had closed its Cockeysville office, that it "sold" ID cards, and that the state's investigation of ACT was prompted by the opening of its Baltimore office. Applying the test articulated in *Gomba v. McLaughlin*, 180 Colo. 232, 504 P.2d 337, 338–39 (1972) (en banc), the district court held that these statements, although false, did not cause the story to produce a different effect on the audience than would have been produced had the truth of the matter been spoken.

Since they were immaterial, the false statements were not defamatory.

■ This was certainly a proper application of the law of defamation. If the gist or "sting" of a statement is substantially true, "minor inaccuracies will not give rise to a defamation claim." *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 601 (D.C.Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). Here, the district court correctly found that Group W's false statements did not occur in connection with any portion of the broadcast that tended to injure ACT's reputation. There can be little doubt that, had Group W reported that ACT charged nothing for its ID cards and that the Cockeysville office remained open, the story would have affected ACT's reputation in the community in substantially the same manner. The damaging portions of the broadcast were those disclosing that ACT was under investigation by state authorities[2] and those discussing the existence of official concern about the use of ID cards showing test results. These statements were true and true statements, no matter how damaging to the plaintiff, may never provide the foundation for a defamation claim. *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Nor may the plaintiffs succeed in their attempt to combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim. The dis-

---

**1.** Our discussion of the district court's disposition of the motion for summary judgement deals only with the elements of the claim for defamation since, under Maryland law, "[r]egardless of whether a declaration is styled as a defamation action or an invasion of privacy action, the same considerations and legal standards apply." *Phillips v. Washington Magazine, Inc.*, 58 Md.App. 30, 36 n. 1, 472 A.2d 98, 101 n. 1, *cert. denied*, 300 Md. 89, 475 A.2d 1201 (1984). We also note that corporations do not enjoy the same right of privacy that individuals do. *See, e.g., United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950). Indeed it seems very unlikely that a corporation can ever state a cognizable claim for false-light invasion of privacy. *See Oasis*

*Nite Club, Inc. v. Diebold, Inc.*, 261 F.Supp. 173, 175 (D.Md.1966). However, in light of the coincidence of the elements of defamation and false-light invasion of privacy, we do not reach the question of the cognizibility of the false-light claim.

**2.** In a futile attempt to come up with a colorable claim of defamation, ACT argues that it was not "under investigation," but rather was the object of a "collegiate study" by state authorities. This contention is belied by documents in the discovery record in which officials from both the Attorney General's office and the State Department of Health explicitly state that their offices are investigating ACT.

trict court's grant of summary judgment to Group W based on the immateriality of the false statements was proper and we therefore affirm this aspect of the court's ruling.[3]

### C. Dismissal of the Claims of the Individual Plaintiffs

In addition to dismissing ACT's claims against Group W, the district court dismissed all of the claims of the individual plaintiffs, ACT's investors. The court found that none of the statements in the challenged broadcasts defamed or even mentioned the individual plaintiffs: the broadcasts dealt exclusively with ACT as a business organization. Similarly, the court found that Caplan's allegedly defamatory letters also spoke exclusively of ACT and made no mention of the investors.

■ The dismissal of the individuals' claims was clearly proper and supported by the applicable law. Common sense, as well as the law of defamation, dictates that, in order for a claim for defamation to arise, a publication must refer to the individual who seeks to sue on the publication. *See National Shutter Bar Co. v. G.F.S. Zimmerman & Co.*, 110 Md. 313, 318, 73 A. 19, 21 (1909), *overruled on other grounds, Cranson v. I.B.M. Corp.*, 234 Md. 477, 200 A.2d 33 (1964). The mere fact that a publication might injure the investors in a business does not give rise to a claim for defamation in those investors unless the publication appears to refer to the investors individually when "construed in the sense in which hearers or readers of common and reasonable understanding would ascribe to [it]." *Goldborough v. Orem & Johnson*, 103 Md. 671, 682, 64 A. 36, 40 (1906). In order to actionably defame an individual, a publication must contain some "special application of the defamatory matter" to the individual. *Arcand v. Evening Call Pub. Co.*, 567 F.2d 1163, 1164 (1st Cir.1977). The "circumstances of the publication [must] reasonably give rise to the conclusion that there is a particular reference" to the individual. *Church of Scientology of Cal. v. Flynn*, 744 F.2d 694, 697 n. 5 (9th Cir.1984); *see also Provisional Gov't of Republic of New Afrika v. American Broadcasting Cos.*, 609 F.Supp. 104, 108 (D.D.C.1985) ("Allegations of defamation by an organization and its members are not interchangeable. *Statements which refer to an organization do not implicate its members*") (emphasis added).

In addition to unsuccessfully challenging the substantive basis for the dismissal of their claims, the individual plaintiffs also assert that, once the district court had dismissed ACT's claim against Group W for the October 29 broadcast, it lost jurisdiction over the remaining claims. ACT's claim against Group W for the October 29 broadcast was the only claim as to which diversity existed. The appellants argue that, once the court had dismissed this claim, it immediately lost jurisdiction over the rest of the action since the other claims would not be "removable if sued upon alone." 28 U.S.C. § 1441(c). This argument, however, misconstrues the nature of the federal courts' removal jurisdiction.

■ Once a cause of action has been removed, the "district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction." *Id.* The disposition of the diversity claim does not immediately divest a district court of jurisdiction over the pendent state claims that are properly

---

**3.** The appellants also contest two other rulings that the district court made in connection with the grant of summary judgment to Group W. They challenge the holding that ACT qualified as a limited-purpose public figure and they maintain that, even if ACT was a public figure, the court erred in holding that Group W acted without actual malice. Our decision that Group W committed no actionable defamation obviates the need to reach these other contentions and we therefore decline to do so.

The appellants also argue that the broadcast of November 4 is defamatory because it incorporates by reference the false statements in the October 29 story. Since we hold that the inaccuracies appearing in the October story were immaterial and therefore not actionable, we need not consider this argument. If the misstatements gave rise to no actionable defamation when they were broadcast in October, they are equally incapable of creating a cause of action even if they were incorporated into the story aired in November.

before it. *See Rosado v. Wyman,* 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970); *Ondis v. Barrows,* 538 F.2d 904, 908 (1st Cir.1976). After a district court has disposed of the jurisdiction-conferring claim, it will then take into account considerations of judicial economy and fairness to the litigants in determining whether to retain jurisdiction over the residual, pendent state claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). There can be little doubt that, in the present case, these considerations militated in favor of disposing of as many of the plaintiffs' claims as possible. The district court committed no error in dismissing the claims of the individual plaintiffs.

*D.   Quashing of Post–Discovery Subpoenas*

■ Well after the close of discovery, the plaintiffs subpoenaed two witnesses to testify at the hearing on the motion to amend the complaint. Choosing to decide the motion based solely on the record before it, the district court quashed these subpoenas. The appellants challenge this ruling.

The record shows that, well before the close of discovery, the plaintiffs knew of the existence of these two individuals. In spite of this knowledge, the plaintiffs failed to depose these witnesses in time for their testimony to be included in the record that the court considered at the hearing. Having failed to properly prosecute their case, the plaintiffs may not now look to this court to remedy the problem that is entirely of their own making. Rule 43(e) of the Federal Rules of Civil Procedure provides that a court may hear a motion "on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition." Nothing in the wording of the rule even hints that it is an abuse of discretion for a district court to refuse to hear testimony at a motions hearing. *Cf. World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 366 (2d Cir.1965) ("Motions may be decided wholly on the papers, and usually are, rather than after oral examina-

tion and cross-examination of witnesses"). It was not error for the district court to quash the subpoenas.

In summary, we reject all of the appellants' contentions and affirm, in its entirety, the district court's disposition of the case. We hold that it was within the discretion of the court to refuse to grant the plaintiffs leave to amend their complaint; that the dismissal of ACT's claims against Group W and the dismissal of all of the claims of the individual plaintiffs were fully justified under the law of defamation; that the district court did not lose jurisdiction of the pendent state claims when it dismissed the claim against Group W for the October broadcast; and that the district court was well within its discretion in quashing the subpoenas issued after the close of discovery.

AFFIRMED.