**Roger CHAPIN and Help Hospitalized Veterans, Plaintiffs,**

**v.**

**Frank GREVE, Philadelphia Newspapers, Inc., Knight–Ridder, Inc., and The Philadelphia Inquirer, Defendants.**

**Civ. No. 91–1020–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 17, 1992.

---

Frank M. Northam, Webster, Chamberlain & Bean, Washington, D.C., for plaintiffs.

Dane H. Butswinkas, Williams & Connolly, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a diversity libel suit. Plaintiffs, an individual fundraiser and one of his non-profit organizations, sue various media defendants for alleged defamations arising out of a newspaper report about a charitable project to send holiday care packages to American military personnel stationed in the Persian Gulf during Operations Desert Shield and Desert Storm. The central question presented by defendants' motion to dismiss is whether the newspaper report is actionable. For the reasons set forth here, the Court concludes that the article is not actionable, and thus plaintiffs' complaint should be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6), Fed.R.Civ.P.

### I.

Plaintiff Roger Chapin is the founder, president, and a member of the board of directors of plaintiff Help Hospitalized Veterans ("HHV"), a California non-profit corporation with offices in San Diego, California, and Falls Church, Virginia. Established in 1971, HHV distributes craft kits (model airplanes, macrame, and the like) to patients and occupational therapy departments in military and veterans hospitals. HHV, which raises funds through direct mail solicitations to individuals throughout the country, has distributed over 11,000,000 of these craft kits, the result of over $75,-000,000 in donations. Chapin also founded, in 1989, a non-profit, anti-drug educational and lobbying organization called Citizens for a Drug Free America ("CDFA").

In the fall of 1990, during Operation Desert Shield in the Persian Gulf, Chapin organized the G.I. Christmas Gift Pac project as a special project of HHV. The Gift Pac project solicited donations for the purpose of sending holiday care packages containing candy, cookies, dried fruit, and other snack food items to American soldiers stationed, and later fighting, in the Persian Gulf. Donors were asked to contribute fifteen dollars for one Gift Pac or twenty-five dollars for two. Six additional dollars were assessed for delivery to a specified soldier. Chapin and HHV promoted the Gift Pac project through paid and unpaid television and newspaper advertising, direct mail, newspaper stories, radio and television interviews, and endorsements of radio and television talk show hosts. Well-known personality Art Linkletter served as Gift Pac spokesman. The Gift Pac project used stationary that listed prominent "Friends of Hospitalized Veterans," including, among others, Doris Day, Julius Erving, Whoopi Goldberg, Bob Hope, Arnold Palmer, Major General George Patton, III, General V.H. Krulak, and General William Westmoreland.

Promotional literature generated by the Gift Pac project represented that all money donated to the Gift Pac project would be used exclusively for the project and includ-

ed a guarantee that a dollar's worth of goods, based on retail value, would be shipped for each dollar donated. According to the promotional materials, HHV paid an average price of $13.60 for each Gift Pac, while the actual retail value was $14.40, excluding handling costs. The promotional materials further claimed that if a donor purchased equivalent Gift Pac contents and shipped them herself, the total cost would be about $19.00. Any contributions remaining after deducting all "fulfillment, donor acquisition and administrative expenses" were, according to the literature, to be used to purchase more Gift Pacs or donated to the U.S.O. for its work in the Persian Gulf. A footnote in the promotional materials stated that "[o]ver the first $2,900,000 in donations, administrative salaries have accounted for less than ½ of 1%," suggesting that nearly three million dollars had already been raised and that only a small fraction of that sum had been used for salaries. The Defense Department apparently provided shipping for the Gift Pacs from Port Elizabeth, New Jersey, to the Persian Gulf.

On December 1, 1990, defendant Frank Greve wrote an article about the Gift Pac project (the "Greve article"). The Greve article was published by defendant Philadelphia Newspapers, Inc., in the business section of the *Philadelphia Inquirer*[1] on December 2, 1990, under Greve's byline (*see* Appendix I). At the same time, defendant Knight–Ridder, Inc., disseminated a substantially similar version of the Greve article on its wire service (*see* Appendix II), which was thereafter picked up and used by other media.[2]

The Greve article begins by stating that the Gift Pac project was charging "hefty mark-ups" for the goods contained in the care packages. It then describes the operational and financial mechanics of the Gift Pac project, including costs to donors, and characterizes the project as "wildly successful," noting that 170,000 Gift Pacs were already en route to the Persian Gulf via military cargo ships. Next, the story states its central interrogatory theme: "But one question is hard to answer: Who will benefit more from the project—GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?" Greve then offers evidence supporting his proposition that it is hard to determine whom the Gift Pac project most benefits. The story reports facts (many of which plaintiffs allege are false) and raises questions concerning the financial circumstances of CDFA, the accuracy of statements made to prospective donors by Gift Pac telephone order-takers, the accuracy of the designation of Generals Patton, Westmoreland, and Krulak as sponsors on the Gift Pac letterhead, the wholesale and retail value of Gift Pac contents, a possible accumulation of surplus donations, and the eventual disposition of those possible surpluses. With respect to possible surpluses, the article states that "it is unclear where the rest of the money goes" and recounts allegedly conflicting statements made by Chapin regarding their use. According to these statements, surpluses would either be reinvested in the Gift Pac project to purchase additional care packages or be donated to HHV or the U.S.O. The story also juxtaposes an admonishing remark by Representative Fortney H. "Pete" Stark,[3] who had been critical of CDFA, with an endorsement by Gift Pac

---

**1.** The *Philadelphia Inquirer* is a named defendant in this case. The Court has expressed doubts about whether it is a legal entity and therefore a proper party to the action. Given the decision reached here, however, the Court need not decide this issue.

**2.** Because they are substantially similar in all material respects, the *Philadelphia Inquirer* article and the wire release version will be referred to collectively as the "Greve article." Direct citations will be to the article as published in the *Philadelphia Inquirer*. Defendants will hereinafter be referred to collectively as "Greve".

**3.** The full paragraph reads:
"I just hope that the cost reports of $14 or more per kit are, in fact, true," said Rep. Fortney H. "Pete" Stark (D.Calif.), a member of the House Select Committee on Narcotics, who was sharply critical of Chapin's earlier anti-drug effort. "No one should line their pockets by playing on the sentiments of the holiday season."

spokesman Art Linkletter.[4] Finally, the story ends with three paragraphs about a container of dates included in the Gift Pac, a detail characterized by Greve as "summing up" the issue of the Gift Pac's value. The first of these paragraphs reports the price Chapin paid for the dates (about 87 cents) and the price he assigned as the retail value ($1.99). The second paragraph notes that according to their label, the dates required storage in a cool place, whereas the Defense Department required that shipped food be able to withstand 100 degree heat. In the last paragraph, the article facetiously suggests that in any event sending dates to the Persian Gulf is like sending coals to Newcastle. "It might be easier for GIs to pick dates off a nearby date palm," the article explains, since Saudi Arabia is the world's leading date producer and exporter.

Chapin and HHV, citing a decline in donations to the Gift Pac project and HHV after the article's publication, sued defendants for defamation. Reduced to its essence, plaintiffs' complaint alleges that the Greve article, taken as a whole, is libelous because (i) it directly accuses Chapin and HHV of "dishonesty, profiteering and defrauding the public and preying upon patriotic sentiments to enrich themselves;" and (ii) it insinuates and implies that Chapin and HHV together defrauded the public, operated a "bogus charity," and profiteered from the war, and that Chapin himself was a corrupt businessman who gained personal financial benefit from the Gift Pac project.

Defendants moved to dismiss the complaint under Rule 12(b)(6), Fed.R.Civ.P., on the ground that it fails to state a claim upon which relief can be granted because the Greve article is not actionable. The Court, having heard oral argument on several occasions and having reviewed extensive briefs by both sides, concludes that the Greve article is not actionable and, accordingly, that the motion to dismiss should be granted.

## II.

Defamation cases, especially against media defendants reporting on matters of public concern,[5] compel a careful balancing of vital constitutional and common law rights. On one side of the balance is the First Amendment's fundamental protection of free expression, a free press, and "that 'breathing space' essential to their fruitful exercise." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). *See also Ollman v. Evans*, 750 F.2d 970, 991 (D.C.Cir.1984) (en banc) ("For the contraction of liberty's 'breathing space' can only mean inhibition of the scope of public discussion on matters of general interest and concern."), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). On the other side lies the individual's liberty interest in his reputation, the importance of which was articulated by Justice Stewart: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring). *See generally Milkovich v. Lorain Journal Co.*, 497 U.S. 1, ——, 110 S.Ct. 2695, 2707–08, 111 L.Ed.2d 1 (1990) (discussing the need in defamation cases to balance First Amendment guarantees and individual reputational interests); *Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008 (same); *Ollman*, 750 F.2d at 974 (defamation cases present the "delicate and sensitive task" of accommodating essential First Amendment interests and the common law's protection of an individual's reputation, which is an interest "of the highest

---

**4.** The statement reads, "I'm not a part of his organization, but I believe in what he's doing," Linkletter said, "I know he's a good guy. I'm betting on his record."

**5.** The Greve article addresses at least two matters of public concern: (i) the national response in late 1990 to the American military involvement in the Persian Gulf and (ii) the financial accountability and integrity of charitable organizations soliciting funds from the general public.

order"). Libel law attempts to accommodate these seemingly antithetical interests by, on the one hand, providing a legal remedy for persons subjected to certain defamatory statements, while, on the other hand, limiting the range of statements considered defamatory as a matter of law.

■■■ Under Virginia law, the necessary elements of the tort of defamation are (1) publication about the plaintiff, (2) an actionable statement, and (3) the requisite intent. *See Michie's Jurisprudence* Libel & Slander § 12.[6] Here, the dispositive issue is whether the Greve article constitutes an actionable statement.[7] The determination whether a statement is actionable is a matter of law. *See, e.g., Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C.Cir.) (en banc), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); *Wilder v. Johnson Pub. Co., Inc.*, 551 F.Supp. 622 (E.D.Va. 1982); *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985); Restatement (Second) of Torts § 614 (1977). To be actionable, material must be both false and defamatory. *See, e.g., Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986); *Falwell v. Penthouse Intern., Ltd.*, 521 F.Supp. 1204 (W.D.Va.1981); *Gazette v. Harris*, 229 Va. 1, 325 S.E.2d 713 *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). Because plaintiffs' allegations of factual falsity must be accepted as true for purposes of this motion to dismiss, *see Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324 (4th Cir.1989), the threshold inquiry here is whether the Greve article is defamatory.[8]

■■■ To defame a person is to attack his or her good name, thereby injuring his or her reputation. *See* Webster's II New Riverside University Dictionary (1984). But not every unflattering or unwelcome remark will sustain a libel suit. To be defamatory as a matter of law, a statement must be "more than merely unpleasant or offensive;" it must "make the plaintiff appear odious, infamous, or ridiculous." *McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 540 F.Supp. 1252, 1254 (D.D.C. 1982), *aff'd in part and rev'd in part on other grounds*, 717 F.2d 1460 (D.C.Cir. 1983). *See also* R. Sack, *Libel, Slander and Related Problems* 45 (1980) ("There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing, or that hurts the plaintiff's feelings, without more, is not actionable."). Statements may be defamatory by implication, inference, innuendo, or insinuation, provided the alleged defamatory meaning is plain. *See, e.g., Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2707; *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C.Cir.1990); *Wilder*, 551 F.Supp. at 623; *Gen. Products v. Meredith Corp.*, 526 F.Supp. 546 (E.D.Va.1981); *Gazette*, 325 S.E.2d at 713; *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588, 591–92 (1954). The established test under Virginia law for divining whether statements are defamatory is found in *Carwile*:

Although varying circumstances often make it difficult to determine whether particular language is defamatory, it is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used. ... In determining whether the

---

6. Virginia libel law applies to his diversity action. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

7. The first element, publication about the plaintiff, is undisputed. Given the Court's holding here that no actionable statement exists, the Court need not, and does not, address the third element of requisite intent.

8. In fact, plaintiffs do not allege that every statement in the article is false. Nevertheless, as the majority are alleged to be false, it is sensible for purposes of analysis to begin with the question of defamation.

words and statements complained of in the instant case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor. However, the meaning of the alleged defamatory language can not, by innuendo, be extended beyond its ordinary and common acceptation. The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it can not introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain.

82 S.E.2d at 591–92 (citations omitted). Moreover, a plaintiff cannot combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim. *See AIDS Counseling & Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000 (4th Cir.1990). In addition, under Virginia law statements which impute to a business or professional person conduct which tends to injure her in her business or profession are actionable as defamation *per se*, without proof of special damages. *See Carwile*, 82 S.E.2d at 592.

■■■ But the inquiry into whether a statement is actionable does not end with a determination that it is, or is not, defamatory. Not all defamatory statements are actionable. First, as earlier noted, a defamatory statement must be false to be actionable, truth being an absolute defense to a libel action. *See, e.g., Freedlander v. Edens Broadcasting, Inc.*, 734 F.Supp. 221 (E.D.Va.1990). Second, certain statements of opinion, even if defamatory, are constitutionally protected. *See Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2705–08; *Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3007. Specifically, opinion statements, defamatory or otherwise, are not actionable unless they contain provably true or false factual connotations. *See Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2705–06.[9] Third, in some circumstances defamatory words are not actionable under the doctrine of libel by implication of true facts. *See White*, 909 F.2d at 512. Under this doctrine, liability for libelous implications drawn from true facts attaches only where there is "by the particular manner or language in which the true facts are conveyed ... affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *White*, 909 F.2d at 520 (emphasis in original). As plaintiffs correctly assert, *White* applies only where the facts giving rise to an alleged defamatory implication are true.[10]

---

**9.** In the span of time separating the Supreme Court's decisions in *Gertz* and *Milkovich*, the Fourth Circuit developed a test for deciding whether a defamatory statement was actionable fact or constitutionally-protected opinion:

the threshold inquiry is whether the challenged statement can be objectively characterized as true or false. If the statement cannot be so characterized, it is not actionable, but if the challenged statement can be so characterized, then three additional factors must be considered to determine whether the statement is nevertheless an opinion because 'a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly.' *Potomac Valve [ & Fitting, Inc. v. Crawford Fitting Co.]*, [829 F.2d 1280] at 1288 [ (4th Cir.1987) ]. These additional factors are the author or speaker's choice or words; the context of the challenged statement within the writing or speech as a whole; and the broader social context into which the statement fits.

*Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 685 (4th Cir.1989). *See also Potomac Valve &* *Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288–89 (4th Cir.1987). Thus, under *Blue Ridge Bank*, if a challenged statement can not objectively be characterized as true or false, it is constitutionally-protected opinion. After *Milkovich*, however, a further inquiry must be made, namely whether a statement that cannot be objectively characterized as true or false and which would otherwise be classified as protected opinion nevertheless contains provably true or false factual connotations that render it actionable.

**10.** Plaintiffs assert that *White* has no application here because they allege that the facts reported in the Greve article are false and must be accepted as false for purposes of the motion to dismiss. *See, e.g., Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102. A close examination of their complaint and pleadings, however, reveals that at least some of the facts reported in the article are not alleged to be false. Thus, *White* may apply to the extent that any claimed defamatory implications arise from uncontested true factual statements in the article.

### III.

These principles applied here point persuasively to the conclusion that the Greve article is not libelous as a matter of law. The dispositive question presented is whether or not a reasonable factfinder could conclude that the article or statements in the article state or imply, in their plain and natural sense, the defamatory meanings ascribed to them by plaintiffs in their complaint. *See Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2707; *Carwile*, 82 S.E.2d at 591–92.

Plaintiffs first allege that the article directly accuses them of "dishonesty, profiteering and defrauding the public and preying upon patriotic sentiments to enrich themselves." This is simply untrue. The article directly states no such thing. Neither those words, nor synonymous ones, appear in the article.[11] The most similar statement is Congressman Stark's remark that "no one should line their pockets by playing on the sentiments of the holiday season." But this is not a direct statement that plaintiffs were lining their pockets or playing on the sentiments of the holiday season.[12]

■ Plaintiffs next allege that the Greve article conveys by implication and insinuation the defamatory meanings (i) that they defrauded the public, operated a bogus charity, and profiteered from the war and (ii) that Chapin is a corrupt businessman who gained personal financial benefit from the Gift Pac project. Plaintiffs identify several statements they contend contribute, when viewed within the context of the whole article, to these alleged defamatory meanings. In evaluating these statements and the article as a whole, the Court relies on their plain and natural meanings, drawing all fair inferences in favor of plaintiffs. *See Carwile*, 82 S.E.2d at 591–92.

■ First, plaintiffs challenge statements regarding the wholesale and retail costs of the Gift Pac contents and possible surplus contributions. Specifically, they object to the combined effect of two statements: (1) "The wholesale value of a 'Gift Pac' is about $8, according to grocery buyers. Chapin, in a promotional new [sic] conference held on Oct. 30, said he'd bought at prices 'below wholesale'" and (2) the statement that contributors pay $15.00 for a Gift Pac. Plaintiffs assert that this combination of statements implies profiteering or gouging. The facts in these statements are not alleged to be false. Under the *White* doctrine of libel by implication of true facts, therefore, the question is whether affirmative evidence exists from the text of the article itself suggesting that Greve intended or endorsed the defamatory inference of profiteering or gouging. *See White*, 909 F.2d at 520. The answer to this question must be "no", as the article, taken as a whole, does not reasonably appear to intend or endorse a charge of profiteering or gouging. Instead, it merely questions "where the rest of the money goes" and then discusses various charitable uses for possible surpluses.

Plaintiffs assert that reporting the possibility of surpluses or implying that surpluses may exist based on the difference between wholesale and retail prices[13] is de-

---

11. Such words, had they been used, would likely have been defamatory, suggesting, as they do, the sort of conduct that would reasonably tend to injure a non-profit professional in his occupation. *See Carwile*, 82 S.E.2d at 592.

12. Nor can the article's quotation of Stark's remarks reasonably be viewed, when considered in the context of the article as a whole and in light of its juxtaposition with the Linkletter endorsement, as an implicit allegation that plaintiffs were in fact lining their pockets or otherwise operating a scam. *See Carwile*, 82 S.E.2d at 591–92.

13. This implication of possible surpluses arises from the fact that donors were advised that for their $15.00 contribution they were receiving roughly $15.00 worth of goods based on retail prices, whereas the Gift Pac project purchased the goods at lower wholesale prices. Thus, since the wholesale cost of each Gift Pac was actually less than the $15.00 donors paid, some amount of money would be leftover. Plaintiffs correctly argue, and the Greve article explicitly recognizes, that there are numerous possible uses for this extra money, many of which may be perfectly legitimate.

famatory because it suggests that either more money was collected than required for the Gift Pacs or donors received less in each Gift Pac than they were promised. In this suggestion of surplusage, plaintiffs find defamatory inferences of deceptive or fraudulent fundraising, as well as profiteering and gouging. Yet the article clearly prefaces the word "surplus" with the word "possible." No allegation of actual surpluses is made. Even if one were made, the fact of a surplus is not by itself reasonably capable of conveying the defamatory meanings ascribed by plaintiffs, nor is the existence of a surplus inherently defamatory when tied to a charitable organization. Taken in its plain and natural meaning, the fact of a surplus linked to a charitable organization does not reasonably or by fair implication imply deceit, fraud, gouging, dishonesty, or the like. It may simply indicate a more efficient operation than anticipated or that the charity was more successful than planned and thus able to take advantage of larger volume discounts. Or a surplus may indicate inefficiencies. But the suggestion of inefficiency, if present, would not rise to the level of actionable defamation in these circumstances. And significantly, the article reports three legitimate, non-defamatory uses for any surplus funds: more Gift Pacs, HHV craft kits, or a contribution to the U.S.O. No other possibilities, proper or improper, are mentioned.[14]

Second, plaintiffs identify as libelous certain statements regarding the Gift Pac project's benefit to Chapin. In particular, plaintiffs point to the statement "But one question is hard to answer: Who will benefit more from the project—GIs or veteran charity entrepreneur Roger Chapin...." As an initial matter, plaintiffs' argument that it is defamatory to suggest that Chapin personally benefited in any manner from the Gift Pac project is absurd. There is nothing defamatory, for example, in stating that a professional fundraiser benefits from his charitable work by way of salary, enhanced professional reputation, or a heightened sense of personal achievement. Such benefits are routine, seemly, and perfectly acceptable. Plaintiffs object in particular, however, to an inference they find in the statement that Chapin gained personal financial benefit. Yet financial benefit for a charitable fundraiser in and of itself is not defamatory. Chapin admits he draws a salary for his work for HHV.[15] Nor is it within the plain and natural meaning of the statement to infer that Chapin gained personal financial benefit by dishonest means or at the expense of benefit to the intended charitable beneficiaries.[16] The sentence does not suggest that the GIs did not benefit from the care packages. To the contrary, it states that it is hard to tell who will benefit more, suggesting that both Chapin and the GIs benefited to some degree. The fact of benefit to the GIs is clearly reinforced by the statement in the article that 170,000 care packages were already en route to the

---

14. Along these same lines, plaintiffs object to the term "hefty mark-ups." Even if use of the term "hefty" in conjunction with "mark-ups" could reasonably be construed as defamatory, it is merely a subjective value judgment containing no provably true or false factual connotations and is thus not actionable. *See Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2706–07. It is not susceptible to proof by any objective core of evidence. *Id. Cf. National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.,* 705 F.2d 98 (4th Cir.) (statement that plaintiff, a charitable organization, did not spend a "reasonable" amount on program services was a protected opinion, not a defamatory statement of fact), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

15. According to plaintiffs' pleadings, this salary was independent of the success or failure of the Gift Pac project.

16. Even if such defamatory inferences could reasonably be attributed to this statement, it would not be actionable. Whether a question is hard to answer and whether Chapin benefited more than the GIs are both assertions not provable as false by any objective core of evidence. *See Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2706–07. It is impossible to quantify the benefit a soldier received from his enjoyment of a Gift Pac care package in terms that would permit a viable comparison with any financial or other benefit Chapin may have obtained.

Persian Gulf.[17]

 Third, plaintiffs allege that a further series of statements also implies that Chapin is deceitful. For instance, they object to two references to Chapin's declining to be interviewed or respond to written questions about the Gift Pac project. Plaintiffs claim these statements suggest Chapin was being evasive in order to hide improprieties. Yet refusing to answer reporters' questions is commonplace and certainly cannot reasonably be said to tarnish one's reputation. People in the public eye do it all the time. There is nothing odious or disgraceful about it. Moreover, Greve provides Chapin's plausible, non-defamatory explanation for declining to answer questions: he considered unfair earlier reporting about his organization CDFA. With respect to CDFA, plaintiffs also object to a paragraph reporting that CDFA ended the year 1989 with a negative bank balance. They maintain that this reference carries the defamatory meaning that Chapin is corrupt and a cheat. Yet such a reading clearly extends the paragraph beyond its plain and natural meaning. There is nothing legally defamatory about a negative bank balance in these circumstances. That a statement may be upsetting or embarrassing is not enough to make it an actionable.

 Plaintiffs also regard several paragraphs describing "problems" with the Gift Pac project as evidence of the defamatory inference of fraud. Specifically, these passages report the failure of telephone order-takers correctly to inform donors about shipping schedules and the listing as sponsors of the Gift Pac effort of three retired generals who in telephone interviews did not recall their association with Chapin. Taken in the context of the article as a whole, the fair implication of these statements is not one of fraud, although it may be one of carelessness. Plaintiffs also find inferences of deceitfulness in the Greve article's statement that Chapin gave conflicting statements about possible surpluses. It is undisputed that on different occasions Chapin made different statements about the destination of any excess donations. There is nothing reasonably defamatory in stating or implying that someone is uncertain about his intentions, especially where, as here, the several expressed intentions were charitable, and none involved personal gain. Greve is not responsible for every defamatory implication a reader might draw from his report of true facts, absent evidence that he intended the defamatory implication. No reasonable or fair implication can be drawn from this true report of conflicting statements that Chapin was lying to hide personal profit, nor is there affirmative evidence that Greve intended or endorsed this implication. *See White*, 909 F.2d at 520.

 Fourth, plaintiffs argue that the use of business terminology in the article insinuates defamatory meanings of impermissible profit-making when used with respect to a charitable organization. Specifically, plaintiffs object to the phrases "charity entrepreneur" and "bottom line."[18] The latter, according to plaintiffs, denotes profit, in an accounting sense, and indicates a false assertion of the Gift Pac project's financial situation. No reasonable reader would interpret the phrase, in context, as a definitive statement of the Gift Pac project's financial figures. The full statement uses the qualifying words "appears to be" and "seems to be." These are statements of uncertainty and cannot reasonably be read so as to make them certain. *See Carwile*, 82 S.E.2d at 592. More significantly, the phrase "bottom line" as used here connotes "cutting to the chase," not

---

**17.** This latter statement also negates plaintiffs' allegation that the article implies that HHV and the Gift Pac project were "bogus" charities. It may (or may not) be that a different allocation of contributions would have resulted in benefit to more soldiers, but that does not mean that the project failed to serve its intended purpose or that the charity was a sham or fraud. The only other reference to HHV in the article is a neutral, factually accurate description of HHV as "a provider of craft kits to VA hospitals."

**18.** The latter statement reads in full: "Bottom line: Chapin's costs for the $15 gift packs appear to be under $10. In a snack food industry where normal markups are about 35 percent, Chapin's charity seems to be posting better than 50 percent."

an accounting conclusion. The former term, "charity entrepreneur," cannot reasonably be viewed as meaning that Chapin, as a charitable fundraiser, was profiteering or pocketing funds. In the business arena, an entrepreneur is one who organizes and operates a business venture with the hope of making a profit, that is, with the hope of having a successful venture. *See* Webster's II New Riverside University Dictionary (1984). In our economic and social system, this is a positive endeavor. Here, prefaced by the word "charity," the term "entrepreneur" suggests a person who organizes and operates a non-profit venture in the hope of making it successful, that is, in the hope of raising substantial sums money for the venture's charitable purpose. Furthermore, "entrepreneur" connotes commendatory qualities of innovation, enthusiasm, and diligence. Thus, the Court disagrees with plaintiffs that the phrase may reasonably be construed in its ordinary and common acceptation as defamatory. Moreover, the application of business terms or concepts to a charitable organization is not inherently defamatory. Financial accountability is an integral part of charitable fundraising. Recognizing this, the Gift Pac project's promotional literature extols its efficient use of donor money and the relatively small proportion expended on administrative salaries. Of course, in some cases a statement that uses business-like terms to suggest that a charity is really for-profit or is raising money for an impermissible use may be actionable. But this is not such a case. The Greve article plainly reports that donor money is being used for its intended and legitimate purpose: to send holiday treats to soldiers. The article merely raises questions regarding the methods employed to achieve this objective.

Fundamentally, the Greve article raises questions about the Gift Pac project. In the Court's view, it is a story constructed around questions, not conclusions. But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances. Questions are not necessarily accusations or affronts. Nor do they necessarily insinuate derogatory answers. They may simply be, as they are here, expressions of uncertainty. The Greve article advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is necessarily true and the other false. Language of ambiguity and imprecision permeates the article, significantly coloring its tone. Examples include: "possible surpluses," "hard to answer," "appear to be under $10," "seems to be posting," "it is not clear where the rest of the money goes." This tentative language underscores the interrogatory tenor of the article.[19] That someone raises questions about a highly publicized venture, charitable or otherwise, does not necessarily impair reputation, especially where credible and legitimate answers are furnished. Moreover, to extend the meaning of the article to the defamatory meanings alleged by plaintiffs would impermissibly make certain that which is deliberately left uncertain by the article itself. *See Carwile*, 82 S.E.2d at 592. While reporters should not have license to hurl unfounded allegations, it is equally important to preserve the "breathing room" afforded the press by the First

---

19. The headline appended to the *Philadelphia Inquirer* version of the Greve article—"A gift for GIs that may not be such a treat"—also reflects the indefinite and interrogatory character of the article. Defendants Greve and Knight–Ridder assert that they cannot be held liable for the headline, as they neither composed it, nor attached it to the article. This was apparently done by employees at the *Philadelphia Inquirer.*

The headline does not appear on the Knight–Ridder wire release. The Court need not reach the merits of these arguments, however, because the headline, regardless of its relationship to any particular defendant, is not reasonably capable of conveying the defamatory meanings of fraud and deceit ascribed to it by Chapin and therefore is not actionable. *See Carwile*, 82 S.E.2d at 591–92.

Amendment. *See Gertz,* 418 U.S. at 323, 94 S.Ct. at 2997; *Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2706; *McBride,* 717 F.2d at 1466 ("We do not mean to suggest by any means that writers and publications should be free to defame at will, but rather that suits ... should be controlled so as to minimize their adverse impact upon press freedom.").[20]

This "breathing room" is essential where matters of public concern are involved. *See Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2706–07. "[O]ne of the most important considerations [in determining whether a statement is defamatory] is whether the person alleging defamation has in some real sense placed himself in an arena where he should expect to be jostled and bumped in a way that a private person need not expect." *Ollman,* 750 F.2d at 1002, 993 (Bork, J., concurring) ("Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments."). This examination of the plaintiff's status is not generally recognized as a dispositive factor in a defamation analysis. *Id.* at 1002. Nonetheless, it sheds light on the presence of defamatory meaning. Here, Chapin and HHV affirmatively and intentionally placed themselves in the public eye. Indeed, the success of the Gift Pac project depended on public awareness and support. Gift Pac promotional materials proclaim the vast extent of HHV's fundraising, several million dollars having

already been raised. The materials also claim for HHV efficient and judicious use of the contributions. The Gift Pac literature describes elaborate and extensive access to media, including television and radio advertising and talk shows. Chapin and HHV knowingly and purposefully thrust themselves into two significant matters of public concern: the national response to American military activities in the Persian Gulf and the accountability and integrity of charitable organizations. By so doing, they invited attention and comment about their efforts. Although not an invitation to libel, it was, in the circumstances of this case, properly an invitation to investigate and question.[21] That is all Greve did.

## IV.

In sum, the Court is not persuaded that the Greve article, taken as a whole and considering the plain and natural meaning of its language, can reasonably be read as directly stating or indirectly implying the defamatory meanings ascribed by Chapin in his complaint. Chapin may have found the story embarrassing or annoying, but that is not enough to subject these defendants to a libel action. Having thus pled no actionable statement, Chapin's complaint must be dismissed as failing to state a claim upon which relief can be granted under Rule 12(b)(6), Fed.R.Civ.P.

An appropriate Order has entered.

---

**20.** Also comfortably within the scope of this protected "breathing room" is imaginative, hyperbolic expression. *See Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2706. *See also Blue Ridge Bank,* 866 F.2d at 685. Thus, Greve's description of GIs picking dates off palm trees—an obvious example of imaginative and humorous hyperbolic expression—is not actionable. In his briefs, Chapin objects to the entire set of paragraphs regarding the dates. In the Court's view, however, the plain and ordinary meaning of these paragraphs does not reveal any defamatory inference. In any event, these paragraphs are not cited, quoted, or referenced in Chapin's complaint and hence cannot form a basis for this libel action.

**21.** The Court does not decide, nor need it decide, the similar but separate question whether plaintiffs are public, limited public, or private figures for purposes of determining whether negligence or actual malice is the requisite intent. *See Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2703–07; *Gertz,* 418 U.S. at 342–48, 94 S.Ct. at 3008–3011; *Blue Ridge Bank,* 866 F.2d at 686–89. Even so, it is worth noting that the limited record developed thus far strongly suggests that plaintiffs are at least limited public figures required to show actual malice.

# A gift for GIs that may not be such a treat

By Frank Greve
Inquirer Washington Bureau

WASHINGTON — While many American businesses are donating products to GIs stationed in Saudi Arabia for the holidays, a widely promoted charity is charging hefty mark-ups on goods it ships to them.

The drive, called "G.I. Gift Pac," promises to "make every effort" to deliver by Christmas what ads and telephone order takers describe as $15 worth of "cookies and candy, dried fruit, tasty nuts and other holi-

day treats." Contributors pay $15 for one box or $25 for two. It costs $6 more for each delivery to a specific GI.

The widely successful project, promoted in television and newspaper advertising, already has 170,000 gift packs en route to the Persian Gulf via military cargo ships, according to the packager, Precise Kit Promotions Inc of Ho-Ho-Kus, N.J. Sales of up to 500,000 are projected, the packager said.

But one question is hard to answer:

Who will benefit more from the project — GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?

Chapin's previous venture was an anti-drug crusade that raised $7.1 million in 1989, spent $6.8 million of it on direct mail, and ended the year with a negative bank balance of $39,486, according to Internal Revenue Service records. Chapin declined to be interviewed about the "Gift Pac."

Other people, however, raised questions about the "G.I. Gift Pac" effort, which is being carried out under the auspices of another charity organized by Chapin, Help Hospitalized Veterans.

Among the problems.

• Telephone order takers don't tell contributors this, but the last shipment likely to reach the Persian Gulf before Christmas sailed Nov. 27, according to Steve Gould, president of Precise Kit Promotions, which as-

(See PACKAGES on 5-C)

Inquirer Photographer / TOM REED

"Gift Pac" items cost about $8 wholesale. They're yours for $15.

12-2-90 Philadelphia Inquirer (Business Section)

# Questions arise about some gifts

PACKAGES, from 1-C

sembles Chapin's gift packs.

• Three eminent retired generals, William C. Westmoreland, Victor Krulak and George Patton 3d, are named as "friends" on letterheads used in "Gift Pac" promotional material. But all three, in telephone interviews, said they had no knowledge of the effort and recalled no association with Chapin.

• The wholesale value of a "Gift Pac" is about $8, according to grocery buyers. Chapin, in a promotional new conference held on Oct. 30, said he'd bought at prices "below wholesale."

• With the Defense Department picking up the costs of shipping the gift packs from Port Elizabeth, N.J., to the Persian Gulf, and "many major television and radio stations" contributing advertising time, according to Chapin, it is not clear where the rest of the money goes. Gould said he charges $1 for packaging, and the trucking bill to Port Elizabeth adds 18 cents.

Bottom line: Chapin's costs for the $15 gift packs appear to be under $10. In a snack-food industry where normal markups are about 35 percent, Chapin's charity seems to be posting better than 50 percent.

Chapin declined to answer written questions about all these issues, saying earlier reporting about his anti-drug effort, Citizens for a Drug Free America, had been unfair.

He has made conflicting statements about the handling of possible surpluses from the "Gift Pac" drive. "Gift Pac" promotional material distributed this fall said surpluses, if any, would go to Chapin's Help Hospitalized Veterans, a provider of craft kits to VA hospitals. In a brief conversation this week, Chapin said surpluses would be used to buy more gift packs or possibly be donated to the USO, a military charity.

"There was some discussion of

Roger Chapin
*Originator of "G.I. Gift Pac"*

## What's in typical 'G.I. Gift Pac'

- Hadley's whole dates, 8 oz.
- Pepperidge Farm cookies, 7.7 oz.
- Eagle honey roasted nuts, 5 oz.
- Pringles potato chips, 7 oz.
- Del Monte raisins, 6 oz.
- Duncan Hines cookies, 11 oz.
- Brach's hard candies, 3 oz.
- Pepperidge Farm goldfish, 6 oz.
- Cornnuts corn snacks, 6 oz.
- Sunline Sweet Tarts, 2 oz.

that, but only if we were partners in the project. We are not partners in the project," said Chapman Cox, president and chief executive officer of the USO.

"We do not participate in their solicitations and do not make representations about their legitimacy," Cox said. "I cannot speak at all for any financial accountability, or the

cost or the value of the goods. That's their responsibility, not ours."

"I just hope that the cost reports of $14 or more per kit are, in fact, true," said Rep. Fortney H. "Pete" Stark (D., Calif.), a member of the House Select Committee on Narcotics, who was sharply critical of Chapin's earlier anti-drug effort. "No one should line their pockets by playing on the sentiments of the holiday season."

TV personality Art Linkletter, spokesman for the "Gift Pac" campaign in its advertising, said in a telephone interview that he had "been doing things with Richard [sic] Chapin for several years."

"I'm not a part of his organization, but I believe in what he's doing," Linkletter said. "I know he's a good guy. I'm betting on his record."

The issue of the gift pack's value is summed up by what Chapin says is its most expensive item — an eight-ounce plastic container of whole dates. Chapin paid Hadley Date Gardens of Thermal, Calif., about 87 cents for them, according to Hadley sales manager Sean Dougherty. In an accounting intended to support the claim that the gift pack is worth nearly $15, Chapin assigns a $1.99 "retail value" to the dates.

"Keep in a cool place," recipients are instructed on the lid of the Hadley's container of dates. According to Defense Department shipping instructions, however, "any food items must be able to withstand seven to 10 days' transit in heat of 100 degrees and even after delivery must continue to withstand similar temperatures."

It might be easier for GIs to pick dates off a nearby date palm. Saudi Arabia, the world's leading date producer and exporter, grew 596,000 tons of them last year, according to the U.S. Department of Agriculture's Foreign Agricultural Service

---

## APPENDIX II

/1

[WB]Charity charging hefty markup in "G.I. Gift Pac" promotion

(EDITORS: In 3rd graf. HoHoKus, N.J., is correct.)

(PHOTO: details below)

(HAS TRIM)

By Frank Greve

Knight–Ridder Newspapers

WASHINGTON—While many American businesses are donating their products to GIs stuck in Saudi Arabia for the holidays, a widely promoted charity is charging hefty markups on goods it ships to them.

The drive, called "G.I. Gift Pac," promises to "make every effort" to deliver by Christmas what ads and telephone order takers describe as $15 worth of "cookies and can-

dy, dried fruit, tasty nuts and other holiday treats." Contributors pay $15 for one box, $25 for two, $6 more for each delivery to an individual GI.

The wildly successful project, promoted in heavy TV and newspaper advertising, already has 170,000 gift packs en route to the Persian Gulf via military sealift, according to the packager, Precise Kit Promotions Inc. of HoHoKus, N.J. Sales of up to 500,000 are projected, the packager says.

But the question of who will benefit more from the project GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign—is hard to answer.

Chapin's previous venture was an anti-drug crusade that raised $7.1 million in 1989, spent $6.8 million of it on direct mail, and ended the year with a negative bank balance of $39,486, according to Internal Revenue Service records. He declined to be interviewed.

Other sources, however, raised serious questions about the "G.I. Gift Pac" effort, which is being carried out under the auspices of another charity organized by Chapin called Help Hospitalized Veterans.

Among the problems:

_Telephone order takers don't tell contributors this, but the last shipment likely to reach the Persian Gulf before Christmas sailed Nov. 27, according to Steve Gould, president of Precise Kit Promotions, which assembles Chapin's gift packs.

_Three eminent retired generals, William C. Westmoreland, Victor Krulak and George Patton III, are named as "friends" on letterheads used in "Gift Pac" promotional material. The three, in telephone interviews, said they had no knowledge of the effort. Westmoreland and Patton recalled no association with Chapin.

Although some retailers in monopoly markets might charge up to $15 for the snacks in the gift pack, their wholesale value is about $8, according to grocery buyers. Chapin, in a promotional press conference

Oct. 30, said he had bought at prices "below wholesale."

With the Defense Department picking up the costs of shipping the gift packs from Port Elizabeth, N.J. to the Persian Gulf, and "many major television and radio stations" contributing advertising time, according to Chapin, it is not clear where the rest of the money goes. Gould charges $1 for packaging, he said in an interview, and the trucking bill to Port Elizabeth adds 18 cents.

Bottom line: Chapin's costs for the $15 gift packs appear to be under $10. In a snack food industry where normal markups are about 35 percent. Chapin's charity seems to be posting better than 50 percent.

Chapin declined to answer written questions about all these issues, saying Knight–Ridder had been unfair in earlier reporting about his drug war effort. Citizens for a Drug Free America.

Chapin has made conflicting statements about the handling of possible surpluses from the "Gift Pac" drive. "Gift Pac" promotional material distributed this fall said surpluses, if any, would go to Chapin's Help Hospitalized Veterans, a provider of craft kits to VA hospitals. In a brief conversation this week in which he declined to offer further comment. Chapin said surpluses would be used to buy more gift packs or possibly be donated to the USO, a respected military charity.

"There was some discussion of that, but only if we were partners in the project. We are not partners in the project," said Chapman Cox, president and chief executive officer of the USO, in a telephone interview.

The United States is assisting in delivering "Gift Pacs" to Saudi Arabia, Cox said. "But we do not participate in their solicitations and do not make representations about their legitimacy. I cannot speak at all for any financial accountability, or the cost or the value of the goods. That's their responsibility, not ours."

"I just hope that the cost reports of $14 or more per kit are, in fact, true." said Rep. Fortney H. "Pete" Stark, D–Calif., a mem-

ber of the House Select Committee on Narcotics who was sharply critical of Chapin's earlier drug war effort. "No one should line their pockets by playing on the sentiments of the holiday season."

TV personality Art Linkletter, spokesman for the "Gift Pac" campaign in its advertising, said in a telephone interview that he had "been doing things with Richard (sic) Chapin for several years."

Linkletter continued, "I'm not a part of his organization, but I believe in what he's doing. I know he's a good guy. I'm betting on his record."

The issue of the gift pack's value is summed up by what Chapin says is its most expensive item—an eight ounce plastic container of whole dates. Chapin paid Hadley Date Gardens of Thermal, Calif., about 87 cents for them, according to Hadley sales manager Sean Dougherty. In an accounting intended to support the claim that the gift pack is worth nearly $15, Chapin assigns a $1.99 "retail value" to the dates.

"Keep in a cool place," recipients are instructed on the lid of the Hadley's container of dates. According to Defense Department shipping instructions, however, "any food items must be able to withstand seven to 10 days' transit in heat of 100 degrees and even after delivery must continue to withstand similar temperatures."

It might be easier for GIs to pick dates off a nearby date palm. Saudi Arabia, the world's leading date producer and exporter, grew 596,000 tons of them last year, according to the U.S. Department of Agriculture's Foreign Agricultural Service.